George JACKSON, Plaintiff, Appellant,

v.

LIQUID CARBONIC CORPORATION, et al., Defendants, Appellees.

No. 87–2073.

United States Court of Appeals, First Circuit.

Heard April 6, 1988.

Decided Dec. 1, 1988.

As Amended Dec. 13, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 29, 1988.

Gail Strassfeld with whom Judith Mizner, Silverglate, Gertner, Fine, Good & Mizner, and Marjorie Heins, Massachusetts Civil Liberties Union Foundation, Boston, Mass., were on brief for plaintiff, appellant.

Kathleen Edwards with whom Norman Holtz, Holtz and Gilman, P.C. and Brian P. Curtis, Corporate Counsel, Boston, Mass., were on brief for defendants, appellees.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This appeal presents a narrow question, but one of considerable significance. It requires that we decide whether an ex-employee's state-law claims for invasion of privacy, mounted in the wake of the employer's unilateral inauguration of a drug-testing program (on the supposed authority of a collective bargaining agreement), are preempted by the terms and tenor of section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982).[1] The district court answered this inquiry in the affirmative, and dismissed the former employee's suit. Although we regard the question as close, we believe that the district court reached the appropriate result. We therefore affirm.

### I. BACKGROUND

Beginning in 1976, plaintiff-appellant George Jackson toiled for defendant-appellee Liquid Carbonic Corporation (L–Corp), principally as a truckdriver. At all times material hereto, L–Corp and Local 49, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers, were parties to a collective bargaining agreement (Agreement), and Jackson, a union member, was part of the bargaining unit. By early 1986, plaintiff was working out of appellee's terminal in Tewksbury, Massachusetts and was engaged in hauling pressurized gases—materials which were invariably volatile, often hazardous, and deserving of cautious handling. It was work of a kind where, one suspects, there might be old practitioners, and there might be bold practitioners—but there would likely be few (if any) old, bold practitioners.

In compliance with regulations issued by the Federal Highway Safety Administration, *see* 49 C.F.R. § 391.41 (1987), L–Corp's truckdrivers were required to submit to biennial medical examinations. The examination necessitated, inter alia, that a urine specimen be taken and a urinalysis performed to check for diabetes. *See* 49 C.F.R. § 391.43 (1987). But in March 1985, appellee added a new wrinkle; it disseminated a document entitled "Transportation Bulletin I–13" in which it announced that the urine samples would thereafter be screened not only for diabetes, but for the presence of alcohol and various narcotic drugs. L–Corp then distributed consent forms and notified the drivers that permitting these tests to be performed was a condition of continued employment.

Neither Local 49 nor plaintiff challenged the broadened protocol when management inaugurated it. Rather, Jackson signed the

---

1. Section 301 reads in relevant part:
    Suit for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction of the parties....
    29 U.S.C. § 185(a) (1982).

consent form, reported for his next scheduled examination several months after the format was amended, and gave a urine specimen. The new tests were performed. On February 13, 1986, Jackson was informed that traces of marijuana had been detected. A week later, notwithstanding his denial of all marijuana use, he was dismissed. Plaintiff requested an "independent" drug test. The employer declined. The firing stood.

At this juncture, we refer to the pertinent provisions of the Agreement. The union pact was in effect both in 1985 (when the drug-testing program was announced) and in 1986 (when appellant underwent his medical examination). Article XXI comprised a fairly standard "management rights" clause, giving L–Corp "the right to post reasonable rules and regulations from time to time...." Article XII rendered all disputes "involving the meaning, application, or interpretation of, or compliance with, the provisions of" the Agreement subject to mandatory grievance and arbitration procedures. Jackson never pursued the grievance procedures available to him thereunder, although, shortly after his discharge, representatives of Local 49 met with management to discuss the situation. After the lone informational meeting, and in the absence of any formal complaint by the aggrieved employee, the union took no further action.

The matter, however, was far from over. That December, appellant brought an action in a Massachusetts state court seeking, inter alia, an injunction barring further drug testing and an award of damages. L–Corp removed the case to the United States District Court for the District of Massachusetts. Because of the acknowledged presence of diversity of citizenship and a controversy in the requisite amount, 28 U.S.C. § 1332(a), jurisdiction is not in issue.[2]

Jackson's complaint alleged that his employer had coerced him into providing the urine sample, then wrongfully tested it for evidence of drug ingestion, leading to the supposed detection of marijuana and the end of his job tenure. He fashioned three statements of claim, which may be paraphrased as follows:

1. The search and seizure of his urine without any previous suspicion of drug use violated the Massachusetts Civil Rights Act (MCRA), Mass.Gen.L. ch. 12, §§ 11H–11I, by interfering with his rights to privacy and to be free from unreasonable searches and seizures, as secured by both the state and federal constitutions (Count I).

2. The seizure and testing of his urine constituted an unreasonable invasion of his privacy in violation of Mass.Gen.L. ch. 214, § 1B (Count II).

3. His dismissal was contrary to public policy and, under state law, comprised a wrongful discharge (Count III).

Contending that all of Jackson's causes of action were preempted by section 301, *see supra* note 1, defendant moved to dismiss the suit for failure to state any cognizable claim. Fed.R.Civ.P. 12(b)(6). After extensive briefing and argument, the district court granted the motion. This appeal ensued. In its course, Jackson waived any error in the dismissal of Count III, *see* Reply Brief at 15, so we need not concern ourselves with the state-law wrongful termination claim.

## II. DISCUSSION

■ In this instance, the language of section 301 is not, in and of itself, disposi-

2. L–Corp also premised jurisdiction on an alternative basis, viz., the existence of a federal question within the ambit of 28 U.S.C. § 1331—an assertion which hinged on the company's view of section 301. Appellant vigorously disputes this claim. We are spared the necessity of addressing the matter in those terms, as diversity comprises an independently sufficient hook upon which federal jurisdiction may be hung.

tive. Thus, in considering whether appellant's remaining claims are preempted by the statute, we must pay great heed to Congress' intent. *See Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.,* — U.S. —, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988); *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 738, 105 S.Ct. 2380, 2388, 85 L.Ed.2d 728 (1985). Our task in construing the statutory language is "to interpret the words of the[ ] statute[ ] in light of the purposes Congress sought to serve." *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979).

The Supreme Court has long recognized that the breadth of section 301 is no accident, but is commensurate with an overreaching congressional purpose: to "authoriz[e] federal courts to create a body of federal law for the enforcement of collective bargaining agreements—'which law the courts must fashion from the policy of our national labor laws.'" *IBEW v. Hechler,* 481 U.S. 851, 107 S.Ct. 2161, 2165, 95 L.Ed.2d 791 (1987) (quoting *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957)). The reason Congress tendered such a wide-ranging ministry to the federal courts was not only to promote the creation of a uniform body of federal labor law, but also to ensure that, when developed, the resultant rules would be applied through the grievance procedures agreed upon between unions and management. *See Teamsters v. Lucas Flour Co.,* 369 U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1962) (in passing section 301, "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules"); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1964) (noting congressional approval of "contract grievance procedures as a preferred method for settling disputes and stabilizing" the common law of the plant). To the extent that judicial determination of Jackson's state-law claims would conflict with this federal scheme, those claims would be preempted by section 301 and relegated, in the first instance, to the grievance procedures available under the Agreement. *See United Paperworkers International Union v. Misco Inc.,* 484 U.S. 29, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) ("where the [labor] contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanism without dealing with the merits of the dispute").

In *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), the Supreme Court articulated the analytical framework within which we must determine whether Jackson's claims are preempted by section 301. There, the Court defined the scope of the statute's preemptive effect broadly, declaring that "if the policies that animate section 301 are to be given their proper range ... the preemptive effect of section 301 must extend beyond suits alleging contract violations." *Id.* at 210–11, 105 S.Ct. at 1910–11. The Court itself has recently characterized the essential lesson which *Lueck* taught in this regard:

> ... *Lueck* faithfully applied the principle of § 301 preemption developed in *Lucas Flour:* if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles—necessarily uniform throughout the nation—must be employed to resolve the dispute.

*Lingle v. Norge Division of Magic Chef, Inc.,* — U.S. —, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988) (footnotes omitted). Put another way, "§ 301 pre-empts state law only insofar as resolution of the state-law claim requires the interpretation of a collective-bargaining agreement...." *Id.* 108 S.Ct. at 1883 n. 8. With these guideposts in place, we turn to the particulars of the case at bar.

Our preemption inquiry begins with the question *Lingle* requires us to ask: can Jackson's privacy claim be made out without interpreting the Agreement? We con-

clude that it cannot. Because the interplay of state law, labor law, privacy concerns, and contemporary concern over drug use forms so intricate a mosaic, we take some pains to explicate our reasoning.

■ Massachusetts has not prohibited drug testing outright; in the Commonwealth there is no barrier to a person's free and voluntary agreement to be tested. By the same token, neither Massachusetts' constitution nor its statutory scheme accomplish proscription by indirection. Consequently, no absolute right to be free from drug testing exists, at present, under the laws of the Commonwealth. In that particular sense, then, state law creates no rights independent of the Agreement.

The MCRA, to be sure, creates a cause of action against a private party who interferes, by coercion, with rights conferred by either the federal or state constitution. Mass.Gen.L. ch. 12, § 11H. In order to identify whether a cause of action independent of the Agreement exists under the MCRA, we must analyze the rights created by the federal and state constitutions. Only if "an established or recognized state law claim" exists, *Laws v. Calmat*, 852 F.2d 430, 434 n. 5 (9th Cir.1988)—one that does not "depend[ ] upon the meaning of the collective-bargaining agreement," *Lingle*, 108 S.Ct. at 1881—is the initiative saved from the preemptive web.

■ We look first to drug testing under the federal Constitution. Doing so, we find it does not secure an absolute right to be free from employer drug testing. Rather, the ordinary case requires that a court attempt to calibrate the proper balance between an employee's privacy rights and an employer's legitimate concerns. *See, e.g., Laws*, 852 F.2d at 433–34 (upholding drug testing of drivers and other employees in building products company when management asserts rights under collective bargaining agreement to "manage the plant, direct the work force and implement safety rules," and union fails to avail itself of grievance procedure); *Rushton v. Nebraska Public Power Dist.*, 844 F.2d 562, 566–67 (8th Cir.1988) (upholding annual testing of nuclear power plant employees, via uri-

nalysis, for alcohol and narcotics based on "balancing ... the individual's legitimate expectation of privacy and personal security against the government's need for the search"); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 179 (5th Cir.1987) (upholding drug screens of customs officials by means of urinalysis as within the ambit of reasonable conditions of employment held reasonable on "ubiquitous balancing test ... entailing a weighing of the need for the search against its intrusiveness"), *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988); *McDonell v. Hunter*, 809 F.2d 1302, 1307–09 (8th Cir.1987) (sanctioning uniform and random drug testing of correctional officers by means of urinalysis under same balancing test); *Shoemaker v. Handel*, 795 F.2d 1136, 1141–44 (3d Cir.) (upholding random urine testing of jockeys and other racetrack employees against, inter alia, fourth amendment and privacy challenges where New Jersey Racing Commission has interests that circumscribe interests of employees), *cert. denied*, 479 U.S. 986, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986).

Similarly, the Commonwealth's constitution has never been authoritatively construed to secure such an absolute right. Nor would we expect it to be. As a general matter, state constitutional law tracks the development of federal constitutional law. In privacy law, the parallelism is pronounced. *Developments in the Law— The Interpretation of State Constitutional Rights*, 95 Harv.L.Rev. 1324, 1430–41 (1982). Furthermore, even when state courts depart from the federal judiciary's constitutional interpretations, they do so to further their views of the principles embodied in the federal constitution. This pattern, too, holds true in privacy law. *Id.* at 1442–43. We are thus loath to develop an independent innovation in state constitutional doctrine without so much as a hint from the Massachusetts Supreme Judicial Court (SJC) that such a path is open to us. *Accord Laws*, 852 F.2d at 434 n. 5 (Ninth Circuit requires "an established or recognized state law claim"). Nonetheless, while we are bound only by the actual

expression of the state's highest court, *Commissioner of Internal Revenue v. Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967), we may look broadly for guidance in order to establish how the SJC would likely decide the issue. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 903 (1st Cir. 1988) (en banc) (federal court may examine analogous decisions, considered dicta, scholarship and other reliable data to divine state law); *Moores v. Greenberg*, 834 F.2d 1105, 1107 (1st Cir.1987) (similar). "In the process [the federal court] may 'reasonably assume that [the state court] will follow the rule that appears best to effectuate' relevant policies." *Id.* (quoting *Bowen v. United States*, 570 F.2d 1311, 1322 (7th Cir.1978)).

Here, such hints as exist suggest that the SJC will not recognize an absolute right. In addition to the general predilection for parallelism, *see supra*, the Commonwealth's overall approach to privacy concerns argues forcibly against the creation of an inalienable right. Although we have looked long and hard, we have been unable to discern even so much as a policy or trend favoring the establishment of such a right.

■ In Massachusetts, privacy concerns are most clearly embodied in a right-to-privacy statute, Mass.Gen.L. ch. 214, § 1B. The statute, and the cases decided under it, suggest that Massachusetts views the right to privacy in traditional terms. The SJC has opted for balancing that is reminiscent of, if not identical to, the conventional federal approach on the constitutional question. *Bratt v. International Business Machines Corp.*, 392 Mass. 508, 467 N.E.2d 126 (1984), is illustrative. That case involved an employer's disclosure of personal information concerning an employee, alleged to be violative of § 1B as an unreasonable interference with the latter's right of privacy. The SJC ruled that: "In determining whether there is a violation of § 1B, it is necessary to balance the employer's legitimate business interest in obtaining and publishing the information against the substantiality of the intrusion on the employee's privacy resulting from the disclosure." *Id.* 467 N.E.2d at 135–36. The SJC also noted that the balancing test would apply even if medical information were involved. *Id.* at 129, 136 & n. 20.

Because Jackson has alleged a statutory claim, and because the statutory interpretation provides us with the strongest, clearest, most recent, and most reliable data concerning the SJC's approach to privacy, we elaborate in some detail. The statute "proscribes only unreasonable interferences with a person's privacy [and] legitimate countervailing business interests in certain situations may render the disclosure of personal information reasonable and not actionable under the statute." *Id.* at 135 (citations omitted). Interfering with privacy has two components under Massachusetts law: obtaining information and disclosing it. Both are relevant to drug testing. Procuring information may be an interference with a person's privacy. And while "there may be inquiries of a personal nature that are unreasonably intrusive and no business of the employer and ... an employee may not be discharged with impunity for failure to answer such requests," *id.* at 135 (quoting *Cort v. Bristol–Myers Co.*, 385 Mass. 300, 431 N.E.2d 908, 912 n. 9 (1982)), the SJC appears to believe that the most important test of the reasonableness of an intrusion is whether "an employer is prohibited from seeking certain personal data from an employee or a prospective employee." *Bratt*, 467 N.E. 2d at 135 n. 17 (using as examples inquiries prohibited under state statutes). *See also Cort*, 431 N.E.2d at 912–14. The Commonwealth, as of this time, has no statutory prohibition against drug testing.

To be sure, the absence of a state statute is not dispositive of the point. An actionable intrusion, as defined by the SJC, still depends in part on the interest of the employer. But that is of scant solace to appellant. We cannot say, as a categorical matter, that an employee's drug use, at least insofar as it may have an impact on an employee's work, *Bratt*, 467 N.E.2d at 133, 135 & n. 18, is "no business of the employer." To strike so extreme a stance would be to exercise an unconscionable and

willful blindness to the realities of contemporary life. Unable to find, then, that employers have no legitimate interest in an employee's drug use, we are thrown back to the reasonableness inquiry. That inquiry is, of course, little more than a shorthand description of the balancing test.

Before leaving the precincts of state law, we take one further step. Because Jackson has pled a statutory claim, and because we find that statutory analysis so valuable to the larger inquiry, we do not limit ourselves to the legal propriety of the employer's attempt to collect information about employee drug use through drug testing, but pursue the second aspect of a privacy claim as well—disclosure of private information. While we need not dwell unduly on this facet of a privacy claim, we note that Massachusetts interprets publication broadly: "the disclosure of private facts about an employee among other employees in the same corporation can constitute sufficient publication under the Massachusetts right of privacy statute." *Bratt*, 467 N.E. 2d at 134. To the extent that L–Corp's testing plan contemplates sharing the results of the tests with managerial personnel, even if only for the purpose of terminating the employment of a worker who fails the tests, it also implicates this statutorily protected area of privacy. Once again, however, whether the plan thus violates an employee's privacy right depends upon a balancing of the various factors inherent in the situation in order to determine if publication is reasonable. *Id.* at 134–35.

While we do not doubt that the SJC would give sharp scrutiny to drug-testing programs, we are equally confident that Massachusetts, in interpreting its own constitution and statutes, would view the collective bargaining process as an appropriate datum in constructing the needed balance between the worker's privacy rights and the legitimate concerns of management. *Accord Laws*, 852 F.2d at 433, 434 n. 5; *Utility Workers of America, Local 246 v. Southern California Edison Co.*, 852 F.2d 1083, 1086 (9th Cir.1988).[3]

Where, as here, state law does not create a right that is, on its own terms, clearly independent of a collective bargaining agreement, we must, in conducting a preemption inquiry, look to the possibility that a right may nonetheless be independent. *Lingle*, 108 S.Ct. at 1882. Yet if the "pertinent principles of state law require[ ] construing the relevant collective-bargaining agreement," section 301 preempts the state law claim. *Id.* at 1882 n. 7. The question for this court, therefore, reduces to whether the balance of interests as between Jackson and L–Corp necessarily implicates the Agreement in some substantial sense. We think that it does; Jackson's claimed right to privacy is enmeshed in the collective bargaining pact.

A right subject to a balance involving the needs and interests of the parties is, almost of necessity, defined by the parties themselves. As this circuit has previously recognized, privacy rights in the Massachusetts workplace are affected by a firm's own regulations. *Bratt v. International Business Machines Corp.*, 785 F.2d 352, 360–61 (1st Cir.1986) (internal company regulations may enhance employee expectation of privacy; applying Massachusetts law). In this case, where the only legitimate outlet for managerial regulations which may affect the continued employ-

---

**3.** Our dissenting brother credits us with a longer reach than we essay. We neither "prejudge the issue of what constitutes the elements of a state privacy law claim," *post* at 32, nor "proscribe[ ] the possibility that the state might mandate privacy laws which are independent of ... a collective bargaining agreement." *Id.* at 33. We merely hold that, if such a claim exists in Jackson's case, it is based on rights secured by that Agreement and must be pursued, therefore, only in the arbitral forum. L–Corp's drug-testing plan compromises no independent, bedrock, state-law right, presently established, which would allow analysis of the Agreement to be foregone. The commonwealth, of course, remains free to create such a right, either by enacting a sufficiently explicit statute or by a sufficiently pointed judicial explication of such a right. But as matters now stand, neither the Massachusetts legislature nor the SJC lead us in that direction. *See* text *supra.* If this approach "put[s] the cart before the horse," *post* at 33— and we do not believe that is so—it is only because the horse has not yet emerged from the stable.

118

ment and working conditions of the employees is the management rights clause of the Agreement, the putative state-law claim must look to the rights defined under its auspices. In fact, the state-law claim is "inextricably intertwined with consideration of the terms of the labor contract." *Lueck*, 471 U.S. at 213, 105 S.Ct. at 1912.

To illustrate the nature of the symbiosis, we look to the particular state-law claim asserted by Lueck, who decried his employer's handling of insurance claims tortiously and in bad faith. The collective bargaining agreement which was in force dealt specifically with the administration of insurance claims. Moreover, "under [state] law, it appears that the parties to an insurance contract [were] free to bargain about what 'reasonable' performance of their contract obligation entails." *Lueck*, 471 U.S. at 217, 105 S.Ct. at 1914. This being so, the Court concluded that plaintiff's tort claim was bound up with the collective bargaining pact, that is, the claim was "firmly rooted in the expectations of the parties that must be evaluated by federal contract law." *Id.* While "section 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law," *id.* at 212, 105 S.Ct. at 1912, that dictum pertains to "state rules that proscribe conduct, or establish rights and obligations independent of a labor contract." *Id.* (footnote omitted). Where, as in the instant case, a right is one involving a balancing of the parties' interests defined in part by a labor contract, the Court has been quick to recognize a different standard. If state-law rights and obligations do not necessarily "exist independently of private agreements," they "can be waived or altered by agreement of private parties...." *Id.* at 213, 105 S.Ct. at 1912. And to that extent, they can be, and are, preempted by the protective gloss which section 301 provides to those agreements. *Id.*

With this frame of reference in place, we address the particular features of the case before us. As we have stated, Jackson's privacy claims do not rest upon inalterable state-law rights which float free of, and therefore do not require interpreting, the collective bargaining agreement. They are not *necessarily* independent of the labor contract. On the contrary, those claims can only, we believe, be resolved by scrutinizing and evaluating the explicit powers granted to management under the Agreement. After all, in the earlier bargaining, the union ceded to L–Corp the authority to conduct "required" physical examinations and to "post reasonable rules and regulations." *See supra.* In determining whether the drug test to which Jackson was subjected infringed his right to privacy under state law (or under the federal Constitution, for that matter), the single most important consideration is whether the testing was "reasonable" in light of the circumstances then obtaining. *See O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 1497, 94 L.Ed.2d 714 (1987) (plurality opinion) ("the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context"); *Rushton*, 844 F.2d at 566 ("reasonableness of a search depends on the context"). The Fourth Amendment mandates, for example, that a search by public school authorities falls within a classic context altered by the circumstances, arraying the student's bona fide expectations of privacy and personal security against the government's need to police "breaches of public order." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). Similarly, except for independent exogenous rights, the collective bargaining agreement classically provides the context in which an employee's bona fide expectations of privacy and personal security in the workplace are arrayed against the employer's right to exercise supervision and control of a particular kind. In that context, reasonableness almost always requires investigation of the terms of the collective bargaining agreement.

Evaluating the legitimacy of the drug-testing policy requires a similar safari in search of reasonableness. *See Kelley v. Schlumberger Technology Corp.*, 849 F.2d 41, 45 (1st Cir.1988) (reasonableness of company's implementation of drug-testing

policy to be judged by "possibilities apparent" at the time). In that inquiry, too, context is vitally important. Article XXI of the Agreement does not allow L–Corp to issue regulations at will or on whim, but limits the employer's prerogative to the promulgation of "reasonable" rules and regulations. To determine whether that boundary has been observed, the logical starting place is a consideration of how the Agreement allocates the twigs which make up the aggregate of workplace rights into a management bundle and an employee bundle. At the bottom line, the propriety of L–Corp's drug-testing program must be assessed in light of the practices and exigencies of the industry, factors which are routinely considered when interpreting a collective bargaining agreement. *See, e.g., United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960) ("the practice[ ] of the industry and the shop ... is equally a part of the collective bargaining agreement although not expressed in it"); *Maine Central R. Co. v. United Transportation Union,* 787 F.2d 780, 782 (1st Cir.) (similar), *cert. denied,* 479 U.S. 848, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986).

Bathed in this glow, the underlying issues raised by Jackson's privacy claims appear inseparable from an interpretation of what is or is not "reasonable" under the labor contract. Put another way, the dimensions of appellant's cognizable expectation of privacy depend to a great extent upon the concessions the union made regarding working conditions during collective bargaining. If the Agreement allowed L–Corp, as part of the "required" medical examination, to demand that workers assent to the additional laboratory analysis of urine specimens, and L–Corp did no more than exercise this contractual prerogative, then the rationality of Jackson's asserted expectation of urologic privacy would be diminished accordingly. Only by probing the contours of the Agreement can one answer whether the program was legitimately implemented under the auspices of Article XXI (the management rights clause). And Article XII (the arbitration clause) provides the only appropriate vehicle for conducting that examination. In short, assessment of Jackson's allegations necessarily involves an in-depth inquiry into the rights and obligations bestowed by the Agreement.[4] Jackson's privacy claims can only be resolved by deciding whether the employer's conduct was "reasonable" under the labor contract, taking into account the "expectations of the parties." *Lueck,* 471 U.S. at 217, 105 S.Ct. at 1914. This, the caselaw teaches, is quintessentially a matter of federal law. *See, e.g., Lingle,* 108 S.Ct. at 1881.

Our conclusion that Jackson's privacy claims are both negotiable and bound up in the interstices of the Agreement—and thus preempted—is reinforced by the recent decision in *Utility Workers.* There, plaintiffs claimed that the employer's drug-testing program violated privacy rights secured to them under the California constitution. The Ninth Circuit held the claims to be preempted under section 301. Judge Goodwin wrote that:

> [Plaintiffs'] constitutional claims are "substantially dependent" upon the analysis of the collective bargaining agreement and they constitute a properly negotiable subject for purposes of collective bargaining. Resolution of the issue whether [the Union] has bargained away its members' claimed constitutional rights must rest upon [provisions] of the collective bargaining agreement, which recognize [the employer's] right to manage the plant, to direct the working force, and to implement reasonable safety rules and require their observance.

---

**4.** Plaintiff's search-and-seizure claim requires no separate analysis. The fourth amendment bans not all searches and seizures, but only unreasonable ones. *New Jersey v. T.L.O.,* 469 U.S. at 340–41, 105 S.Ct. at 742–43. The Massachusetts constitution affords no greater protection. Inasmuch as "[t]he determination of fourth-amendment reasonableness requires consideration of the totality of the circumstances in a particular case," *Von Raab,* 816 F.2d at 177, the inquiry is, on this point, identical to that which must be undertaken on the more broadly phrased privacy claims.

*Id.* at 1086 (quoting *Lueck,* 471 U.S. at 220, 105 S.Ct. at 1916). In much the same way, because Jackson's claims can be resolved only by interpreting the meaning and scope of Articles IX and XXI of the Agreement in order to gauge the propriety of L–Corp's implementation of a drug-testing policy, section 301 preempts them. Here, the labor/management environment is dominated by a sweeping management rights clause. We are not permitted to ignore a negotiated provision of a collective-bargaining agreement merely because of its familiarity or breadth. Such clauses, whatever pejorative labels may be bandied about, are legitimate. *See NLRB v. American National Insurance Co.,* 343 U.S. 395, 404–09, 72 S.Ct. 824, 829–32, 96 L.Ed.2d 1027 (1952). Our duty in this case is to simply decide whether the clause must be studied in order to make out the privacy claim. *Accord Utility Workers,* 852 F.2d at 1086. Like the district court, we believe that it must.

In this instance, the management rights clause is broad enough that an arbitrator could easily resolve a drug-testing dispute between Jackson and L–Corp based on rights asserted by the latter under the clause. *See S.D. Warren Co. v. United Paperworkers Int'l Union,* 845 F.2d 3, 7–8 (1st Cir.1988); *S.D. Warren Co. v. United Paperworkers Int'l Union,* 846 F.2d 827, 831–33 (1st Cir.1988) (Coffin, J., concurring). For a rule promulgated under such a clause to be considered reasonable, it need only "be related to some legitimate business interest." M. Hill and A. Sinicropi, *Management Rights* 71 (1986). At the very least, the drug testing edict falls colorably within this rubric. *E.g., Association of Western Pulp and Paper Workers v. Boise Cascade,* 644 F.Supp. 183, 186 (D.Or.1986).

Then too, "[a] drug and alcohol testing program, upon which all employees' continued employment depends, is a working condition whether or not it is specifically discussed in the [collective bargaining agreement]." *Laws,* 852 F.2d at 433. A working condition, of course, is a mandatory subject of bargaining and, when it presents a question upon "which the parties disagree," it "must . . . come within the scope of the grievance and arbitration provisions of the collective agreement." *United Steelworkers,* 363 U.S. at 581, 80 S.Ct. at 1352.

In sum, we believe that, as a union member, Jackson was obligated to grieve—not sue—because, under state law, Massachusetts would look to the Agreement to discern the scope of the privacy right which he was attempting to assert. *See supra.* Because L–Corp, by resorting to the clause, purported not implausibly to exercise its legitimate business interest in its employees' capacity to perform their work well and safely, *see Bratt,* 467 N.E.2d at 133, 135 & n. 18, and did so under the auspices of the Agreement, Jackson's state-law claim was preempted under section 301.

Although the authorities are not uniform, other courts have also found claims that employers' drug-testing programs violated state tort laws to be preempted by section 301 because of the degree of imbrication between the claims and the collective bargaining agreements in force. For example, in *Strachan v. Union Oil Co.,* 768 F.2d 703 (5th Cir.1985), the Fifth Circuit ruled that challenged drug tests fell squarely within the scope of the company's "power . . . under the collective bargaining agreement to insist upon medical examinations. . . ." *Id.* at 704. Such claims were termed "grist for the mill of grievance procedures and arbitration." *Id.* at 705. *See also Laws,* 852 F.2d at 434; *Boise Cascade,* 644 F.Supp. at 186 (claim that drug-testing program violated state tort law preempted because it necessitated interpretation of contract provision allowing management to "institute reasonable work rules").

■ While finding preemption appropriate in this case, we hasten to point out that section 301 does not swallow up claims which bear only peripheral relation to the terms of a labor contract. *See Lueck,* 471 U.S. at 211, 105 S.Ct. at 1911 ("not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or other provisions of the federal

labor law"). In *Lingle,* the Supreme Court recently clarified the limits of section 301's preemptive force. There, the Court held plaintiff's claim that her former employer violated a state prohibition against retaliatory discharge not preempted, despite the existence of a collective bargaining agreement affording a contractual remedy for discharge without just cause. 108 S.Ct. at 1829. *Id.* The Court explained that merely because a state-law claim "would require addressing precisely the same set of facts" as a cognizable grievance under a collective bargaining agreement, preemption did not automatically attach. *Id.* at 1883.

We learn from *Lingle* that where the state-law claim is substantially separate from, and will not require appreciable interpretation of, the labor contract in the course of its adjudication, no purpose would be served by a federal bar. In *Lingle,* for example, the Court noted that "even if an arbitrator should conclude that the contract does not prohibit a particular discriminatory or retaliatory discharge, that conclusion might or might not be consistent with a proper interpretation of state law." *Id.* at 1885. Because the just cause provision and the state-sponsored protection against retaliatory discharge were not coterminous, the state-law cause of action was independently maintainable. *Id.* But *Lingle* does not drive the wedge so broadly as to embrace instances where the measure of the state claim must be sized in some significant part by reference to the collective bargaining pact. The reverse is true; Justice Stevens explicitly reaffirmed the bedrock principle of section 301 preemption and the cornerstone of *Lueck,* writing that: "as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 preemption purposes." *Id.* at 1883 (footnote omitted).

The case before us, of course, is a mirror image of *Lingle,* because there is no way to assess the state-law tort claims pleaded here without taking account of the Agreement. Unlike the retaliatory discharge initiative in *Lingle,* Jackson's privacy claims do not merely overlap to some ill-fitting degree with rules established under the labor contract. The central thesis of his suit questions whether L–Corp's drug-testing protocol was reasonable. That thesis demands definitive interpretation of the Agreement as a prerequisite to any attempt to formulate a reasoned response. Inasmuch as the expectations of both management and labor comprise crucial aspect of the reasonableness inquiry, *see O'Connor,* 107 S.Ct. at 1498 (plurality opinion), the Agreement, properly construed, is likely to dictate the result of Jackson's state-law claims. Whereas the retaliatory discharge claim in *Lingle* was distinct and separate from the just cause provision of the collective bargaining pact, the asserted invasion of Jackson's privacy centers on, and is inextricably intertwined in, the reasonableness of drug testing.

Given the integers that must be factored into the calculation of reasonableness, we do not see how, under state law, the Agreement can be omitted from the equation. Though we intimate no view of where the balance may be struck in Jackson's case or any other, we find insufficient justification for imposing by judicial fiat a rigid limitation on the give-and-take of the collective bargaining process which would entirely remove the possibility of drug testing from the labor/management agenda. If the equation is to be accurate, it must prominently feature the labor pact and its due construction. The sum total, therefore, adds up to preemption.

## III. CONCLUSION

We are mindful of the need to "preserve[ ] the central role of arbitration in our 'system of industrial self-government' ". *Lueck,* 471 U.S. at 219, 105 S.Ct. at 1915 (quoting *Warrior & Gulf,* 363 U.S. at 581, 80 S.Ct. at 1352). As the Court has declared: "The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace." *Lucas Flour,* 369 U.S. at 103–04, 82 S.Ct. at 576–77. Grievance and arbitration are important cogs in the machinery. *See Misco,* 108 S.Ct. at 371 ("it must be remembered that grievance

and arbitration procedures are part and parcel of the ongoing process of collective bargaining"). A plaintiff should not be allowed to bypass the grievance procedures established by the labor contract in a case where his claims are so clearly dependent on interpretation of the terms of that contract. Allowing such an end run would surely undermine the structure of industrial self-government.

We need go no further. Because resolution of Jackson's state-law claims "requires the interpretation of a collective bargaining contract," *Lingle*, 108 S.Ct. at 1883 n. 8, it follows inexorably, as night unto day, that section 301 preempts maintenance of the suit in its present form.

AFFIRMED.

BOWNES, Circuit Judge, (dissenting).

In this case, an employee was subjected to random drug testing by his employer as a condition for continued employment. The results from his urinalysis test were positive for the presence of traces of marijuana, and the employee, despite his denial of marijuana use and his request for an independent drug test, was summarily fired from his job. The issue before this court is whether the employee has a state law claim under the Massachusetts Civil Rights Act or other state statutes for invasion of privacy, or whether any such state law claim is preempted by § 301 pursuant to the collective-bargaining agreement in existence between the employer and employees at the time of the testing.

The decision in *Lingle v. Norge Division of Magic Chef,* — U.S. ——, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), is controlling. In that case, a state claim for retaliatory discharge was held *not* to be preempted by § 301, even though there was a collective bargaining agreement provision prohibiting discharge without just cause. The Court held that *"an application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective bargaining-agreement."* *Id.* 108 S.Ct. at 1885 (emphasis added). Since the retaliatory discharge claim did not turn

on the meaning of any provision of the collective-bargaining agreement, the state law remedy was thus "independent" of the collective bargaining agreement. *Id.* 108 S.Ct. at 1882.

This analysis was also followed in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), where the Court stated that "[i]n extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be *inconsistent with congressional intent . . . to pre-empt state rules that* proscribe conduct, or *establish rights* and obligations, *independent of a labor contract." Id.* at 212, 105 S.Ct. at 1912 (emphasis added). Section 301 preempts only those state law claims that are "inextricably intertwined with consideration of the terms of the labor contract." *Id.* at 213, 105 S.Ct. at 1912.

In the instant case, there is nothing in the collective-bargaining agreement which even remotely deals with the subject of drug testing or privacy rights. The majority therefore uses the broad general management rights clause giving the employer "the right to post reasonable rules and regulations from time to time" as the wedge to implicate the collective-bargaining agreement. It then bootstraps itself to the finding that the state law claim is *necessarily* "inextricably intertwined" with the broad labor contract clause. To conclude, however, that such a general clause mandates interpretation of the collective-bargaining agreement when assessing the applicability of a state privacy law claim, is to prejudge the issue of what constitutes the elements of a state privacy law claim. There is no authority for an analysis in which the federal court hypothesizes how the state court would determine what the parameters of its own privacy laws are, and then, based on that guess, effectively precludes the state court from ever making its own determination on the matter by declaring that the issue so determined is preempted by federal law. This approach is to put the cart before the horse.

The majority has, in effect, proscribed the possibility that the state might man-

date privacy laws which are independent of a broad general management rights clause in a collective-bargaining agreement. Such a conclusion is unwarranted—there is nothing to prohibit a state from enacting a law which would create an independent right to be free from random drug testing. And indeed, the Massachusetts Civil Rights Act may encompass such a right, or it may not. But until the Massachusetts court speaks, we do not know, and there is no need to guess. It is simply unsupported to maintain, as the majority does, that the application of the Massachusetts state privacy law "requires the interpretation of [the] collective-bargaining agreement," *Lingle,* 108 S.Ct. at 1885, and is therefore preempted. The majority's approach would make a nullity of any independent privacy rights established by the states. This result, moreover, is in direct conflict with the pronouncements of the Supreme Court, which have not only recognized the existence of state (and federal) rights which are independent of the collective-bargaining agreement, but have steadfastly protected such rights from preemption. As *Lingle* states:

> [T]here is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements.... "[N]otwithstanding the strong policies encouraging arbitration, 'different considerations apply *where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.'* Barrentine, supra,* 450 U.S. at 737 [101 S.Ct. at 1443]." *Atchison, T. and S.F.R. Co. v. Buell,* 480 U.S. 557, [565], 107 S.Ct. 1410, 1415, 94 L.Ed.2d 563 (1987) (emphasis added).

*Lingle,* 108 S.Ct. at 1884. *See also, Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 2223, 96 L.Ed.2d 1 (1987) (federal labor law does not preempt a state law providing a one-time severance payment to employees in the event of a plant closing "since [the state law's] establishment of a minimum labor standard does not impermissibly intrude upon the collective-bargaining process").

Thus, the issue is not, as the majority states, whether random drug testing by an employer is reasonable under the collective-bargaining agreement, but rather, whether it is prohibited by the Massachusetts Civil Rights Act or other state laws. Resolution of this question does not require interpretation of any provisions in the collective-bargaining agreement; what it does require is a decision as to the scope of the state law. Therefore, following *Lingle,* the state law claims in the instant case are not preempted by § 301. Indeed, if anything, the issue in the instant case (independence of invasion of privacy claims from "reasonable regulation" provision in the collective-bargaining agreement) is even more compelling for this conclusion than the issue in *Lingle* itself (independence of state retaliatory discharge claim from "just cause" discharge provision in the collective-bargaining agreement).

The Massachusetts court should be permitted to make its own determination as to the existence or non-existence of a privacy right to be free from random drug testing based on its interpretation of Massachusetts law. This determination can only be made independently of the broad general management rights clause in the collective-bargaining agreement. Whether the employer's drug testing regulations are reasonable regulations, from either the employer's or employee's perspective, is not relevant to whether the Massachusetts Civil Rights Act independently establishes a privacy right to be free from mandatory random drug testing. It is for the *Massachusetts courts* to make this determination. The Massachusetts courts may or may not find that such a privacy right exists under Massachusetts law, but we should not predict, as the majority has done with such confidence, what the Massachusetts courts will decide.

It should be noted that in *Lingle,* Illinois had a clearly defined state tort of retaliatory discharge, and in the instant case, no such clearly defined state law covering privacy rights has yet been articulated by the state courts. This difference, however, provides even more reason for permitting

the state courts to decide in the first instance the breadth of privacy rights under state law.

It must also be pointed out that while a central underpinning of the majority's opinion is that random drug testing is not per se unconstitutional, this question is far from settled. The Supreme Court has not yet made any determination on this, the circuit courts are not in agreement, and the Massachusetts courts have not made any definitive pronouncement. Indeed, there are at least two cases currently before the Supreme Court challenging employee drug testing programs which are considerably more limited in scope, in terms of the circumstances under which such programs are required, than the instant case of mandatory random drug testing. *See Burnley v. Railway Labor Executives' Association,* No. 87–1555 (argued 11/2/88) (appeal of Ninth Circuit ruling which held unconstitutional a Federal Railroad Administration drug testing program for railway employees who are involved in an accident because it does not require particularized suspicion or impairment prior to testing); *National Treasury Employees Union v. Von Raab,* No. 86–1879 (argued 11/2/88) (appeal of Fifth Circuit ruling which upheld a Customs Service drug testing program that requires employees who seek certain job promotions to submit to urine sampling). There are also other cases surfacing which challenge the constitutionality of random drug testing. Moreover, the Massachusetts Civil Rights Act may well be interpreted by the Massachusetts courts to confer greater rights in this area than the federal Constitution does. By using the preemption doctrine, the majority is impliedly deciding for the Massachusetts courts that there is no independent privacy right to be free from random drug testing. This is an unwarranted conclusion at this juncture.

The majority has, in my judgment, erred in two respects: (i) in declaring on its own that the Massachusetts Civil Rights Act encompasses a privacy right which is limited by the reasonableness of the employer's random drug testing program without first permitting the Massachusetts courts to interpret the parameters of its own laws, and effectively foreclosing such a state determination by declaring the issue preempted; and (ii) in declaring that once the Massachusetts Civil Rights Act is so construed, interpretation of the general management rights clause is required to determine the reasonableness of the random drug testing. The scope of the Massachusetts privacy right has not yet been articulated, and it is unwarranted to conclude that interpretation of the broad general management rights clause is required to determine the application of the state law. *Lingle* mandates that § 301 does not preempt the state law claim in the instant case.

The case should be remanded to the state court for a determination of the state law claims.

I respectfully dissent.