885 F.2d 867
 28 Fed. R. Evid. Serv. 1497
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Paul LUSKIN, Defendant-Appellant.
UNITED STATES Of America, Plaintiff-Appellee,
v.
Milton Bachman COHEN, a/k/a Sonny Cohen, Defendant-Appellant.
UNITED STATES Of America, Plaintiff-Appellee,
v.
James J. LIBERTO, Defendant-Appellant.
UNITED STATES Of America, Plaintiff-Appellee,
v.
Joseph LIBERTO, Defendant-Appellant.
 No. 88-5068.
 United States Court of Appeals, Fourth Circuit.
 Argued March 8, 1989.
Decided Sept. 19, 1989.
 
 Andrew Graham (James Patrick Ulwick, Kevin F. Arthur, Kramon & Graham, P.A. on brief), Howard L. Cardin (Cardin & Gitomer, P.A. on brief), Paul Weiss, Michael Stuart Libowitz (Moore, Libowitz & Thomas on brief) for appellants.
 Gregg Lewis Bernstein, Assistant U.S. Attorney (Breckinridge L. Willcox, United States Attorney on brief) for appellee.
 Before DONALD RUSSELL and MURNAGHAN, Circuit Judges, and ROBERT J. STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 In this case, a routine drug courier profile stop by the Baltimore City Police led to the discovery of a murder for hire scheme involving each of the named appellants (Paul Luskin, James Liberto, Joseph Liberto and Milton "Sonny" Cohen), all of whom were convicted by a jury of conspiracy to commit murder and various related weapons charges. These convictions stemmed from a plot to kill Luskin's wife.
 
 
 2
 Prior to trial, each of the appellants filed motions for severance asserting the potential for prejudice from antagonistic defenses. Luskin in particular sought severance on the basis that evidence admissible only against the other defendants might be improperly used against him. Cohen also filed a motion to suppress evidence seized at the time of this arrest. The district court denied all motions for severance as well as the motion to suppress. After a four-week trial, the jury returned verdicts of guilty on all counts against each appellant. Lengthy jail sentences were imposed and a timely appeal was noted by each appellant. As we find no error on record to support a reversal of these convictions, we affirm.
 
 I.
 
 3
 On July 30, 1987, Sonny Cohen and James Manley were arrested at the train station in Baltimore, Maryland. Authorities in Baltimore had been alerted by AMTRAK security officials in Florida that the two men fit the drug courier profile. Specifically, Baltimore officials were advised that Cohen and Manley had purchased round-trip first class tickets with cash, stayed in Florida less than one day prior to returning to Baltimore on a 24-hour train ride, and that Cohen had left a call-back number for his train reservation to an inoperative number.
 
 
 4
 Upon exiting the train, the two men were stopped by Baltimore City Police Detective McVicker and AMTRAK security guards and asked to produce identification. Manley was unable to do so and appeared visibly nervous. In fact, Detective McVicker testified that Manley was shaking and "seemed to be petrified." Suspicions aroused, Officer McVicker and the AMTRAK security guards escorted the two men to an interview room to subject their luggage to a dog sniff. The dogs reacted positively. The officers then obtained a search warrant, searched the luggage and found a loaded AR-15 rifle with a laser scope in Manley's luggage. In the bag carried by Cohen, two loaded pistols, a silencer and 3 1/2 ounces of cocaine were found. Both men were then arrested.
 
 
 5
 Manley entered into a post-arrest plea agreement with the Government and upon his testimony the following facts were extracted. Paul Luskin was involved in a long and bitter divorce proceeding with his wife Marie. At stake was the bulk of Luskin's assets including a successful Florida business. Rather than proceed with the divorce and risk losing such assets, Luskin resolved to have his wife killed. To such an end, Luskin contacted long-time associate Joe Liberto and advised him of his plan. Joe then contacted his brother Jimmy, also a business associate of Luskin, who in turn commissioned Sonny Cohen to kill Marie Luskin in Florida. Such services were to cost Paul Luskin $50,000.
 
 
 6
 Cohen traveled to Florida to carry out the plan. On March 9, 1987, posing as a floral delivery man, Cohen gained entry to Marie Luskin's home and shot her in the head. She survived the wound. Fearing (erroneously) that during his failed attempt to kill her Marie Luskin saw his face, Cohen recruited Manley to aid him in completing the murder contract. In May of 1987, the two traveled to Florida together, devised an elaborate scheme to finish their job, but ultimately failed.
 
 
 7
 Prior to the third and final attempt to kill Mrs. Luskin, Cohen told Manley that there would be a $25,000 bonus if the job were completed on July 28. Apparently, divorce proceedings between the Luskins were soon to begin and Paul Luskin wished to have the matter attended to prior to that time. However, this final attempt on Marie Luskin's life also resulted in failure, and upon return to Baltimore, the two were arrested.
 
 
 8
 Manley's testimony was corroborated by the Government's proffer of various telephone bills, hotel registration forms and credit card receipts. At trial, all appellants denied participation in this murder for hire scheme. Luskin asserted that Cohen and the Liberto brothers were involved in a large scale drug distribution operation in which he had no part. Jimmy Liberto asserted that evidence offered by the Government against him that he often traveled to Florida and owned the gun found in Manley's luggage showed little more than legitimate business travel and a desire for self protection. Joe Liberto asserted that any evidence against him showed only legal activity. Finally, Sonny Cohen asserted that because no one could positively identify him as Marie Luskin's assailant on March 9, there was insufficient evidence to support his conviction.
 
 I.
 
 9
 Each appellant claims error in the trial court's denial of his motion for severance on the ground of antagonistic defenses. Fed.R.Civ.P. 8 permits joinder of defendants in one indictment "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Under this rule, the appellants here were properly named in one indictment as they were all charged with conspiring to murder Luskin's wife.
 
 
 10
 Ordinarily, persons properly joined in an indictment are to be tried together. United States v. Parodi, 703 F.2d 768, 779 (4th Cir.1983). This is especially true where the indictment charges a conspiracy, or a crime having a principal and aider-abetters. United States v. Spitler, 800 F.2d 1267 (4th Cir.1986); United States v. Kuhn, 381 F.2d 824, 838 (7th Cir.), cert denied, 389 U.S. 1015 (1967). However, "[i]f it appears that a defendant ... is prejudiced by a joinder of defendants in an indictment or for trial together, the [district] court may grant a severance of defendants or provide whatever relief justice requires." Fed.R.Crim.P. 14 (emphasis added). "[T]he mere presence of hostility among defendants, ... or the desire of one to exculpate himself by inculpating another are insufficient grounds to require separate trials...." United States v. Ehrlichman, 546 F.2d 910, 929 (D.C.Cir.1976), cert. denied, 429 U.S. 1120 (1977), quoting United States v. Barker, 442 F.2d 517, 530 (3d Cir.), cert. denied, 404 U.S. 958 (1971). Therefore, "[a]ntagonistic defenses do not per se require severance even if the defendants ... attempt to cast blame on each other." United States v. Spitler, supra, at 1271, quoting United States v. Becker, 585 F.2d 703, 707 (4th Cir.1978), cert. denied, 439 U.S. 1080 (1979).
 
 
 11
 Case law makes it readily apparent that motions for severance are rarely granted. United States v. Keck, 773 F.2d 759 (7th Cir.1985). A defendant must show more than "merely that a separate trial would offer him a better chance of acquittal." United States v. Parodi, supra, at 780. Further, "[t]he decision to deny severance, which is within the sound discretion of the district judge, will not be overturned unless the defendant affirmatively demonstrates a clear abuse of discretion through having been deprived of a fair trial and having suffered a miscarriage of justice." United States v. Spitler, supra, at 1271-1272. See also Person v. Miller, 854 F.2d 656, 665 (4th Cir.1989), cert. denied, 104 S.Ct. 1119 (1989). Where severance is sought "on the ground of conflicting defenses [,] it must be demonstrated that the conflict is so prejudicial that the differences are irreconcilable, and that the jury will unjustifiably infer that this conflict alone demonstrated that [all] are guilty." Becker, supra at 707, quoting Ehrlichman, 546 F.2d at 929 and United States v. Robinson, 432 F.2d 1348, 1351 (D.C.Cir.1970). In this case, none of the appellants has made the requisite showing of abuse of discretion by the district court. Each appellant was able to put forth his theory of the case and present evidence to support such a theory. When necessary, limiting instructions were rendered by the district judge to limit any potential prejudice inherent in witness testimony. Such cautionary instructions cleared the way for the jury to make individual guilt determinations. United States v. Parker, 821 F.2d 968, 972 (4th Cir.1987), cert. denied, 108 S.Ct. 1108 (1988). Had the jury believed the evidence proffered by the appellants, verdicts of acquittal would certainly have been rendered. However, in the light of overwhelming evidence against each appellant, the jury was certainly well within its province to convict each appellant on all counts. Nowhere has it been demonstrated that the antagonistic defenses alone resulted in conviction.
 
 
 12
 Further, Luskin's contention that his case should have been severed because of the prejudicial effect of "spillover" evidence must also fail. See United States v. Lawson, 780 F.2d 535 (6th Cir.1985) (per curiam). Here, Luskin was named in each count of the indictment and was in fact the driving force behind this entire scheme. Any evidence as to the activity of other defendants merely points to the extent of the criminal activity in pursuing this criminal plan. Such evidence was essential to the prosecution and was properly admitted.
 
 II.
 
 13
 Appellant Cohen contends that the trial court committed reversible error in denying his motion to suppress the evidence seized at the Baltimore Train Station (two loaded pistols, a silencer, and 3 1/2 ounces of cocaine). This contention, too, is without merit.
 
 
 14
 Not all police-citizen contact invokes the Fourth Amendment. Terry v. Ohio, 392 U.S. 1 (1968). There are three levels of police-citizen encounters: (1) communication between police or citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment; and (2) so-called Terry stops or brief "seizures" that must be supported by reasonable suspicion; and (3) full scale arrests that must be supported by probable cause. United States v. Galberth, 846 F.2d 983 (5th Cir.), cert. denied, 109 S.Ct. 167 (1988), quoting United States v. Berry, 670 F.2d 583, 591 (5th Cir.1982). Here, we believe that the officers in this case acted within the bounds of the law at each level of their encounter with Cohen and properly seized both the weapon and the cocaine from him.
 
 
 15
 At the first level, there is no element of detention or coercion, and the Fourth Amendment is not implicated. Florida v. Royer, 460 U.S. 491, 497 (1983) (mere approach by law enforcement agents, identifying themselves as such, does not constitute a seizure). The second level involves brief detentions and requires "reasonable suspicion" on the part of the law enforcement official based upon "specific and articulable fact which, taken together with rational inferences from these facts, reasonably warrant an intrusion." Terry v. Ohio, supra, at 19. The third level, arrest, requires the existence of probable cause. New York v. P.J. Video, 475 U.S. 868 (1986). Here, the totality of the circumstances shows that the officers acted within the bounds of the established law when questioning, searching and ultimately arresting Cohen at the Baltimore Train Station at each level of policy-citizen contact. The first level was the officers' approach of Cohen and Manley. The second level was the officers' detention of the two to subject their bags to a dog sniff. The principal issue here is whether or not the officers were armed with the requisite quantum of reasonable suspicion that Cohen's luggage contained contraband to justify the dog sniff. Here, the officers had been alerted that Cohen and his traveling companion fit the "drug courier profile." Each elected to return from Florida by train, a 24-hour ride, after staying in Florida (a known drug distribution center) for less than one day. Finally, Manley was recognizably nervous when he spoke to the Baltimore officers. See, e.q., United States v. Mendenhall, 446 U.S. 544 (1980).
 
 
 16
 When an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry and its progeny ... permits the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.
 
 
 17
 United States v. Place, 462 U.S. 696, 706 (1983).
 
 
 18
 Here, the detention to subject the bags to a dog sniff was sufficiently limited in scope under Terry and did not violate Cohen's Fourth Amendment rights. See, e.q., United States v. Whitehead, 849 F.2d 849 (4th Cir.), cert. denied, --- U.S. ---- (1988).
 
 
 19
 Once the dogs reacted positively, the detectives were armed with the requisite probable cause and were justified in detaining the two until a search warrant could be executed legitimizing the third level of this police-citizen encounter. Michigan v. Summers, 452 U.S. 692 (1981); United States v. Whitehead, supra, at 853. Accordingly, the evidence was both properly seized and admitted at trial.
 
 III.
 
 20
 Finally, Appellant Luskin contends that the Government failed to adduce substantial independent evidence of a conspiracy of which Luskin was a member, rendering the trial court's admission of co-conspirator declarations under Fed.R.Evid. 801(d)(2)(E) error. Specifically, Luskin objects to the court's admission of testimony by Sonny Cohen that directly linked Luskin to this murder for hire scheme.
 
 
 21
 Fed.R.Evid. 801(d)(2)(E) allows for the admission of statements made by a co-conspirator if made during the course and in furtherance of the conspiracy, as an exception to the rule against hearsay.
 
 
 22
 However, before a court can admit a co-conspirator's statement the district court must be satisfied that the statement actually falls within the definition of the rule. There must be evidence that there was a conspiracy involving the declarant and the non-offering party and that the statement was made in furtherance of the conspiracy. Existence of the conspiracy and the defendant's involvement in it are preliminary questions of fact which must be resolved by the district court before any statement under the co-conspirator exception is to be admitted. Fed.R.Evid. 104. See Bourjaily v. United States, 107 S.Ct. 2775 (1987).
 
 
 23
 In making a preliminary factual determination as to the existence of a conspiracy, the court may examine the hearsay statements sought to be admitted. Bourjaily, 107 S.Ct. 2781-2782. See also Glasser v. United States, 315 U.S. 60 (1942). This is true because the co-conspirator exception to the rule against hearsay is so firmly rooted in the jurisprudence that the court need not independently inquire into the reliability of such statements. Bourjaily, at 2783. If by a preponderance of the evidence a conspiracy is found to exist, statements by co-conspirators are admissible. Id. "The preponderance standard ensures that before admitting evidence, the court will have found it i[s] more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration." Id. at 2779.
 
 
 24
 In this case, the Government introduced a plethora of evidence to show both that a conspiracy existed and that Paul Luskin was an active participant in it. The Government concedes that much of this evidence was circumstantial, but, as we recently held in United States v. Jackson, 863 F.2d 116, 1173 (4th Cir.1989), such evidence is of equal probative value as direct evidence. That evidence is:
 
 
 25
 (1) Cohen knew prior to his second attempt to kill Marie Luskin that she would be at Bennigan's Restaurant in Hollywood, Florida on July 29, 1987 at a specific time. Marie Luskin was to be at such location to host a dinner meeting for a recently formed single parents support group. Also in attendance at such meeting was Susan Davis, the then-girlfriend of Paul Luskin. At trial, Ms. Davis testified that upon receipt of the invitation to such meeting, she informed Paul Luskin about it and indicated that his wife would be in attendance. Considering the fact that both Liberto and Cohen are Baltimore residents, it is a reasonable inference that they gained the information about Ms. Luskin's movements from Paul Luskin.
 
 
 26
 (2) The first attempt of Mrs. Luskin's life occurred about 10:00 a.m. on March 9, 1987. Within the hour, a telephone call was forwarded from the Marco Polo Hotel, where Sonny Cohen was a registered guest, to Pellucci's Restaurant in Baltimore, owned and operated by Jimmy Liberto. Five minutes later there was a call from Pellucci's to Joe Liberto's home in Florida. One minute after that call ended, there was a call from Pellucci's to Paul Luskin's home in Baltimore. Shortly thereafter, Luskin placed a call from his car telephone to his home in Florida where his wife's aunt answered the phone. Although Marie Luskin has at this time already been shot, the aunt who answered the telephone did not so inform him. Luskin then immediately placed a call to Pellucci's Restaurant. Again, the reasonable inference to be drawn from this evidence when coupled with the events of the day is that Luskin was in fact involved in the conspiracy.
 
 
 27
 These are only two examples of evidence introduced by the Government upon which the district court made a preliminary determination as to the existence of a conspiracy for the purpose of rendering admissible a co-conspirator's statements. We are satisfied that the Government did show, as they must, by a preponderance of the evidence, that a conspiracy existed. Accordingly, the testimony of Sonny Cohen was therefore properly admitted at trial by the district court. See Bourjaily v. United States, supra.
 
 IV.
 
 28
 We can quickly dispose of Luskin's final two arguments raised here on appeal. First, Luskin contends that the Government failed to introduce any evidence that he was an aider or abettor in causing a firearm to be carried during the commission of a crime of violence. As such, according to Luskin, his conviction under 18 U.S.C. Sec. 924(c), which renders criminal the carrying of a firearm during the commission of a violent crime, must fall. Specifically, Luskin argues that because the Government failed to prove that Luskin knew that firearms were to be carried and used by those he hired to kill his wife, his conviction was improper.
 
 
 29
 In charging the jury, the district judge explained
 
 
 30
 Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal.
 
 
 31
 In order to aid and abet another to commit a crime, it is necessary that the defendant willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about, that is to say, that he willfully seek by some act or omission of his to make the criminal venture succeed.
 
 
 32
 Essentially, Luskin's argument is that such an instruction is an improper extension of the Pinkerton doctrine, so named for the holding in Pinkerton v. United States, 328 U.S. 640 (1946). Such doctrine holds that each conspirator may be liable for the overt acts of every other conspirator done in furtherance of the conspiracy.
 
 
 33
 Section 924(c) had been held to apply even if a conspirator had no knowledge that another conspirator was in possession of a gun. See United States v. Brant, 448 F.Supp. 781, 782 (W.D.Pa.1978); United States v. Gironda, 758 F.2d 1201 (7th Cir.), cert. denied, 474 U.S. 1004 (1985).
 
 
 34
 In this case, there was ample evidence that those hired by Luskin carried guns in furtherance of their objective in this conspiracy and that it was Luskin's desire that such objective be carried out. Accordingly, Luskin was properly convicted under 18 U.S.C. Sec. 924(c) here.
 
 
 35
 Finally, Luskin argues that he is entitled to a reversal due to the Government's improper use of derogatory comments about Luskin's character during rebuttal closing argument. Luskin contends that the following colloquy so prejudiced him that he was denied his right to a fair trial:
 
 
 36
 GOVERNMENT COUNSEL: Ladies and gentlemen, this case is about greed, its about arrogance, its about violence. Mr. Allen [defense counsel] claims that Paul Luskin would not plot to murder his wife and the family. Paul Luskin has lived his life, ladies and gentlemen, without regard to others, without regard--
 
 
 37
 DEFENSE COUNSEL; Objection. There is no evidence of that.
 
 
 38
 THE COURT; Just strike that go ahead, Mr. Sollers.
 
 
 39
 DEFENSE COUNSEL; I ask that it be stricken.
 
 
 40
 THE COURT; I just struck it, Mr. Allen.
 
 
 41
 We review the entirety of the prosecutor's remarks under the Fed.R.Crim.P. 52(a) harmless error rule to determine "whether it is more probable than not that the improper remarks materially affected the verdict." United States v. Prantil, 764 F.2d 548, 556 (9th Cir.1985). Upon review, we are satisfied that such a statement, properly struck by the district court, was not so egregious as to deny the appellant a fair trial. See, United States v. Weatherless, 734 F.2d 179, 182 (4th Cir.), cert. denied, 469 U.S. 1088 (1984); United States v. Karas, 624 F.2d 500, 506 (4th Cir.1980), cert. denied, 449 U.S. 1078 (1981).
 
 
 42
 In light of the overwhelming evidence against the appellant, we find this isolated incident had no prejudicial effect upon the outcome of this trial.
 
 
 43
 Having reviewed all the claims of error and found them without merit, the judgments of conviction herein are
 
 
 44
 AFFIRMED.