CARL CORT & others[1] vs. BRISTOL-MYERS COMPANY & others.[2]

Suffolk.   October 5, 1981. — February 18, 1982.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Civil*, Directed verdict, Judgment notwithstanding verdict.
*Privacy. Contract*, Employment.

Employees at will who allegedly were discharged for refusing to furnish
    personal information to their employer stated no claim for damages
    under G. L. c. 214, § 1B, on the ground that their privacy had been
    invaded. [302-303]
An employer has no duty to give a reason for discharging an employee at
    will, and consequently, is not liable to such an employee for breach of
    an implied covenant of good faith and fair dealing if he conceals the
    reason for the employee's discharge or gives a reason that is factually
    unsupportable. [303-306]
In an action by former employees to recover damages from an employer
    who discharged them after they refused to furnish personal information
    in response to the employer's questionnaire, the evidence did not war-
    rant a finding that their discharge was in violation of a legally implied
    covenant of good faith and fair dealing, where public policy considera-
    tions did not warrant imposing liability on the employer and where cer-
    tain of the unanswered questions were relevant to the employees' job
    qualifications, did not invade privacy rights protected by law, and were
    not unduly intrusive. [306-310] ABRAMS, J., concurring.

CIVIL ACTION commenced in the Superior Court on April
16, 1975.

The case was tried before *Lynch*, J.

The Supreme Judicial Court granted a request for direct
appellate review.

*A. Theodore Welburn (John F. Bradley, II*, with him) for
the plaintiffs.

---

[1] Morton Y. Schleffer and David F. Flaherty.

[2] William F. Aldridge and Robert L. Pogorelc.

*Thomas D. Burns* (*Catherine A. White* with him) for the defendants.

WILKINS, J. The plaintiffs, formerly employed as salesmen by the defendant Bristol-Myers Company (Bristol-Myers), appeal from judgments for the defendants. The trial judge entered directed verdicts for the defendants on the plaintiffs' claim that the defendants had unlawfully invaded their privacy. He also entered judgments for the defendants notwithstanding the jury's verdicts for the plaintiffs on the plaintiffs' claims that Bristol-Myers had terminated their employment in bad faith.[3] We affirm the judgments.

We summarize the evidence, recognizing that, in passing on the judge's allowance of the defendants' motions, we must view the evidence in the light most favorable to the plaintiffs. *D'Annolfo* v. *Stoneham Hous. Auth.*, 375 Mass. 650, 657 (1978). Prior to February, 1975, Bristol-Myers had employed the three plaintiffs as salesmen in the Boston area, selling Bristol-Myers drug products to various purchasers, such as hospitals, physicians, and drug stores. Each of the employment agreements was terminable at will. Flaherty had worked for Bristol-Myers for thirteen years; Cort for eleven years; and Schleffer for nine years. There was evidence that the plaintiffs had performed their duties well. In 1974, Bristol-Myers determined that the performance of its Boston sales division had been the worst of any of its sales divisions. The defendant Aldridge, newly designated northeast regional sales manager, instructed the defendant Pogorelc, the Boston district sales manager, to send a questionnaire to each Boston district salesman with instructions to each to answer and return the questionnaire. The

---

[3] The defendants filed a motion for directed verdicts on all counts at the close of the plaintiffs' case, and they renewed the motion at the close of the evidence. The judge allowed the motion when first presented only as to the invasion of privacy claim. He denied it otherwise on both occasions when it was presented. A claim for defamation was submitted to the jury which found for the defendants. That claim is not involved in this appeal. Flaherty received a verdict of $20,000, and Cort and Schleffer $10,000, each, on their claims for bad faith termination of their employment contracts.

plaintiffs, and other salesmen, objected to certain questions as highly personal and offensive, and also as not related in any apparent way to their job performance. It is the demand that the plaintiffs answer this questionnaire that gives rise to their claim of invasion of privacy. We shall subsequently discuss the questions to which the plaintiffs objected.

Pogorelc told each plaintiff that the questionnaire had to be filled out completely. There was evidence that answers to such a questionnaire could be used as a type of psychiatric test. There was no evidence that the answers were so used or were intended to be so used. In November or December, 1974, each plaintiff answered the questionnaire but failed to answer, or, in the case of Cort, gave frivolous answers to, certain questions. On February 19, 1975, Pogorelc gave a letter of warning to each plaintiff. Each letter referred to the recipient's poor job performance. Pogorelc testified that a decision to discharge the plaintiffs had already been made when the letters were drafted, and that the letters of warning were prepared to justify the discharges. Each plaintiff responded in writing that his letter of warning contained inaccuracies. There was evidence that sales in the Boston area, normally credited to the plaintiffs, had been adversely affected by Bristol-Myers's problems in producing one drug and by the loss of a bid on another drug which could have been sold to a group of hospitals.

In circumstances that need not be detailed, each of the plaintiffs was discharged in February or March, 1975. Each received the compensation and other payments to which he was entitled, apart, of course, from the payments to which each claims in this action he is entitled. There was no evidence of any anticipated, measurable future compensation based on past services to which the plaintiffs were entitled.

1. The judge properly allowed the defendants' motion for directed verdicts on the plaintiffs' claims for invasion of privacy under G. L. c. 214, § 1B, and we affirm the judgments entered on this motion. Whatever unlawful invasion of privacy or other claim might have arisen if the defendants had obtained some of the information sought by the ques-

tionnaires, the short answer is that the plaintiffs declined to provide any information they regarded as confidential or personal. The defendants' attempted invasion of privacy, if it was one, failed. Not even a beachhead was established. We are not concerned here with an employee who answered unreasonably intrusive personal questions under the threat of being discharged if he did not answer those questions.

2. The judge correctly allowed the defendants' motion for judgments notwithstanding the verdicts on the plaintiffs' claims that Bristol-Myers terminated their employment in bad faith. The plaintiffs rely on our opinion in *Fortune* v. *National Cash Register Co.*, 373 Mass. 96 (1977), and argue that Bristol-Myers terminated their employment in violation of a covenant of good faith and fair dealing imposed by law in the at-will employment relationship. In the *Fortune* case, we recognized that an employer may not in every instance terminate without liability an employment contract terminable at will. There, we upheld the plaintiff's claim for future commissions based on past service when the employer terminated the plaintiff's employment without good cause and for the purpose of retaining the sales commissions for itself.

In an opinion that was issued after this case was argued, we considered further the question of the rights of an employee at will who was discharged without good cause. *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981). We noted that the absence of good cause to discharge an employee does not alone give rise to an enforceable claim for breach of a condition of good faith and fair dealing. *Id.* at 671. We recognized that termination of at-will employment could give rise to a claim where the reason for the discharge was contrary to public policy. *Id.* at 668 n.6. The employer's predatory motivation in the *Fortune* case can be classified as a reason contrary to public policy. In the *Gram* case, which did not involve an improper motive for the discharge, we went beyond those cases that had allowed recovery for the discharge of an at-will employee because of a motivation which was contrary to public policy. We allowed

the plaintiff, an insurance salesman, who, if not discharged, would have been entitled to renewal commissions, to recover for "reasonably ascertainable future compensation based on his past services." *Id.* at 671, 672 n.10. We concluded that, when an employee is discharged without good cause, the obligation of good faith and fair dealing imposed on an employer makes him liable for the loss of compensation that is clearly identifiable and is related to the employee's past service.

We come then to the circumstances of the case before us. The jury returned a special verdict (Mass. R. Civ. P. 49 [a], 365 Mass. 812 [1974]), and stated that the plaintiffs' at-will employment contracts were terminated in bad faith. This finding was based on an instruction that extended the concept of bad faith well beyond the limits expressed in our holding in the *Fortune* case. The judge charged the jury that each plaintiff could recover for the bad faith termination of his employment contract if Bristol-Myers had no good business or other legitimate reason for the termination and if Bristol-Myers was motivated solely or primarily by "bad faith, malice, ill-will, spite, personal hostility, or retaliation."[4]

The question for our decision is whether the evidence warranted a finding for the plaintiffs on their claims of a bad faith termination of their at-will employment. This is not a case in which the employer, as in the *Fortune* case,

---

[4] The judge acted consistently with this court's repeated suggestion that a case be given to the jury unless there is no substantial doubt that a finding for the defendant is required. In his memorandum explaining his reasons for allowing the defendants' motion for judgments notwithstanding the verdicts, the judge noted various appellate opinions recommending the procedure that he followed. See, e.g., *Smith* v. *Ariens Co.*, 375 Mass. 620, 627-628 (1978); *Soares* v. *Lakeville Baseball Camp, Inc.*, 369 Mass. 974, 975 (1976).

The judge had no substantial doubt on the invasion of privacy claim and directed a verdict for the defendants on that count. At trial, before charging the jury, he questioned whether the principles of the *Fortune* case extended so far as to entitle the plaintiffs to recover for breach of their contracts of employment. Ultimately, adhering to this view, he allowed the defendants' motion for judgments notwithstanding the verdicts.

discharged an employee to deprive him of commissions already earned but not yet payable. Nor is this a case, like the *Gram* case, in which the employee lost reasonably ascertainable future compensation based on past services. There was no evidence that the plaintiffs' future earnings would be based in any respect on past sales of Bristol-Myers products. We have rejected the general concept of job security as a basis for allowing recovery for termination without cause of an at-will employee. *Gram* v. *Liberty Mut. Ins. Co., supra* at 671.

The plaintiffs argue that Bristol-Myers gave pretexts as reasons for terminating their employment. They correctly point out that the jury would have been warranted in finding that Bristol-Myers discharged them, not because of poor work performance, as Bristol-Myers asserted, but because they refused to answer the questionnaire in full. We consider first the claim that because the reason for the discharge was merely a pretext, the plaintiffs are entitled to recover for their discharge without cause. Next, we consider whether the plaintiffs should be entitled to recover if, as the jury could have found, Bristol-Myers discharged them for failure to answer the questionnaire.[5]

We decline to impose liability on an employer simply because it gave a false reason or a pretext for the discharge of an employee at will. Such an employer has no duty to give any reason at the time of discharging an employee at will. Where no reason need be given, we impose no liability on an employer for concealing the real reason for an employee's discharge or for giving a reason that is factually unsupport-

---

[5] The defendants have made no distinction at any time in this case between the liability of Bristol-Myers for wrongful discharge and the liability of the individual defendants for wrongful discharge. Unlike the plaintiff in the *Gram* case, the plaintiffs here did not claim that Aldridge and Pogorelc intentionally interfered with their contractual rights with Bristol-Myers. As agents for a disclosed principal and thus not parties to the employment contracts, Aldridge and Pogorelc seemingly would not be liable for breach by Bristol-Myers of an imposed condition of good faith and fair dealing in the plaintiffs' contracts of employment. See *Porshin* v. *Snider*, 349 Mass. 653, 655 (1965); Restatement (Second) of Agency § 320 (1958).

able. As a kindness to an employee in his seeking future employment, an employer may well not state its reasons fully and accurately. Here, of course, Bristol-Myers's motivation may not have been so noble. We conclude, however, that an at-will employee discharged without cause does not have a claim for damages simply because the employer gave him a false reason for his discharge. The balance of public policy considerations does not support the allowance of recovery of damages in such a case.[6]

We come finally to the question whether the defendants should be liable for discharging any plaintiff for the incompleteness of his response to the questionnaire. As we have already said, the jury would have been warranted in finding, by way of reasonable inference, that Bristol-Myers discharged each plaintiff for this reason. In the context of our opinions concerning the rights of at-will employees discharged without cause, the question is whether some principle of public policy requires that Bristol-Myers be liable for such a discharge.

In assessing this question, we note that no case has been cited to us, nor are we aware of any case, that has imposed liability on a private employer for discharging an at-will employee for the employee's failure to furnish personal information to the employer.[7] Although the Legislature has imposed restrictions on employers' seeking certain information from an employee or prospective employee, it has not forbidden the gathering of information of the character sought in this case.[8] On the other hand, if the questionnaire

---

[6] The fact that whatever reason was given to the employee was false might, however, be relevant if the employer was attempting to conceal the real reason for the discharge and the real reason was contrary to public policy.

[7] We are dealing in this case only with attempts to obtain information from the individual himself and, at this point in our discussion, only with the question whether there was a breach of the condition of good faith and fair dealing.

[8] An employer who subjects an employee or prospective employee to a lie detector test, or requests submission to such a test, is guilty of a crime. G. L. c. 149, § 19B. It is an unlawful practice under G. L. c. 151B, § 4 (9),

sought to obtain information in circumstances that constituted an "unreasonable, substantial or serious interference with his privacy" in violation of the principles expressed in G. L. c. 214, § 1B, the discharge of an employee for failure to provide such information could contravene public policy and warrant the imposition of liability on the employer for the discharge. In short, if Bristol-Myers had no right to ask the questions that the plaintiffs declined to answer, Bristol-Myers could be liable for discharging the plaintiffs for their failure to answer those questions.[9]

for an employer in connection with the discharge of an employee, among other things, to seek information on various subjects, such as (a) arrests in which no conviction resulted, (b) a first conviction for certain minor crimes, and (c) if other conditions are met, convictions of certain misdemeanors that occurred five or more years earlier. There are limitations on an employer's discharging an employee because he failed to furnish certain information regarding his admission to a facility for the care of mentally ill persons. G. L. c. 151B, § 4 (9A).

[9] Most of our decisions involving a claim of unlawful invasion of privacy have dealt with the dissemination of information. See, e.g., *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn*, 374 Mass. 812, 819 (1978) (disclosure of police payroll records not an "unreasonable, substantial or serious interference" with privacy); *Commonwealth* v. *Wiseman*, 356 Mass. 251, 258, 262 (1969) (film concerning conditions at M.C.I. Bridgewater limited to noncommercial distribution). Cf. *Attorney Gen.* v. *School Comm. of Northampton*, 375 Mass. 127, 132 (1978) (disclosure of fact of job application may be an "invasion of personal privacy" under G. L. c. 4, § 7, Twenty-sixth [c]).

In *Broderick* v. *Police Comm'r of Boston*, 368 Mass. 33 (1975), cert. denied, 423 U.S. 1048 (1976), we considered a challenge to the propriety of a questionnaire the police commissioner of Boston submitted to certain Boston police officers. Restrictions on the authority of public employers seeking information from public employees are greater than those imposed on private employers. See *Shelton* v. *Tucker*, 364 U.S. 479 (1960) (right of association, protected by due process clause, violated by statute requiring public school teachers to disclose all organizations to which they have belonged in the previous five years); *Shuman* v. *Philadelphia*, 470 F. Supp. 449, 461 (E.D. Pa. 1979) (inquiry, having no relation to his job performance, concerning police officer's private sexual activities, violated his constitutionally protected right of privacy); *American Fed'n of Gov't Employees, Local 421* v. *Schlesinger*, 443 F. Supp. 431 (D.D.C. 1978) (government violated First Amendment privacy and associational rights in inquiring of religious, social, political, educational, and fraternal associations of employees, their spouses, minor children and dependents). In

We would not go so far as to say that an employer would always be liable for discharging an employee for his refusal to answer questions not relevant to its business purposes. In public policy terms, it is the degree of intrusion on the rights of the employee which is most important. In measuring the nature of the intrusion, at least as to its reasonableness (but perhaps as well as to its substantiality and seriousness), the nature of the employee's job is of some significance. The information that a high level or confidential employee should reasonably be expected to disclose is broader in scope and more personal in nature than that which should be expected from an employee who mows grass or empties waste baskets. A salesman responsible for the sale of drug products to hospitals, doctors, and pharmacists falls in the middle of this range, but toward its upper side. The temperament and dedication of a salesman are important factors in his effectiveness, and questions bearing on these subjects are certainly reasonable and should be expected.

The questionnaire, entitled Biographical Summary, sought information which, it represented, would be held in strict confidence. The subjects covered included business experience, education, family, home ownership, physical data, activities, and aims. In general, each plaintiff furnished answers to the questions concerning his business experience,

---

the *Broderick* case, this court concluded that the questionnaire should be answered because it dealt with an appropriate subject of inquiry.

This opinion simply acknowledges that in the area of private employment there may be inquiries of a personal nature that are unreasonably intrusive and no business of the employer and that an employee may not be discharged with impunity for failure to answer such requests. Maryland has adopted a statute concerning requests for information from job applicants. Md. Ann. Code art. 100, § 95A (1979) (employer may not require job applicants to answer questions about physical, psychological, or psychiatric conditions unless they bear a direct, material, and timely relationship to job capacity). The Supreme Court of California has suggested that a 1972 amendment to the State Constitution concerning the inalienable right of privacy is directed, in part, against "the overbroad collection and retention of unnecessary personal information by . . . business interests." *White* v. *Davis*, 13 Cal. 3d 757, 775 (1975).

education, and family.[10]   Their answers concerning their medical histories are varied.   Questions answered by Flaherty, but not the other two, concerned (a) serious illnesses, operations, accidents, or nervous disorders, (b) smoking and drinking habits, (c) off-the-job problems, and (d) principal worries, if any.   Flaherty and Schleffer answered the request to list "Membership in civic, professional or social organizations (Exclude racial, religious and nationality groups)."

None of the plaintiffs answered the questions under the heading "AIMS."   These questions concerning "AIMS," which we regard as appropriate to ask of a salesman and not improperly intrusive on his privacy rights, asked each to state his qualifications for his job, his principal strengths, his principal weaknesses, activities in which he preferred not to engage, the income he would need to live the way he would like to live, and his plans for the future.[11]   The fact that the plaintiffs had worked for Bristol-Myers for a number of years in no way made the asking of these questions

---

[10] Cort, however, in these areas gave limited answers, one of which he admitted was wrong.   He was not married in 1960, 1961, and 1962.   He listed his dog as a dependent.   He gave no information, as the others did, about parents or siblings, if any.

[11] We have said that no plaintiff answered these questions.   In fact, Cort answered these questions but largely in a flippant manner.   He described the answers as frivolous in a memorandum subsequently sent to his superiors, the individual defendants.   He wrote as to his principal strengths: "Able to leap tall bldg. at a single bound."   As to his principal weaknesses: "Can't land on my feet."   Activities in which he would prefer not to engage: "Filling in questions on forms of *very personal nature* that are no one's business but mine" (emphasis in original).   He suggested "$1,000,000" as the income he would need to live the way he would like to.   Answering concerning plans for the future, he wrote, "Depends on who reads this."

He followed his questionnaire with a memorandum to his superiors asking the value to Bristol-Myers of answers to the following questions: "what medications I may be taking, the age and health of my mother and father, the occupations of my brothers and sisters, the value of my house and the amount of mortgage, whose support outside of my immediate family I contribute to, how much I smoke and drink each day, my wife's maiden name, and what personal problems I have outside of business."

contrary to public policy. When seeking employment with Bristol-Myers, each of the plaintiffs answered a question-naire of the same general nature. They knew, therefore, from the beginning that Bristol-Myers was interested in per-sonal information of this character in assessing a person's qualifications as a salesman.

We express no view as to whether in particular circum-stances specific subjects (beyond those statutorily interdict-ed) may lie outside an employer's right of inquiry so as to make the employer liable for discharging an at-will employ-ee who declines to respond to the inquiry. We conclude that this case is not one in which, on the evidence most favorable to the plaintiffs, public policy considerations jus-tify the imposition of liability on the employer. Most of the unanswered questions were relevant to the plaintiffs' job qualifications and represented no invasion of the plaintiffs' rights of privacy protected by law. Questions about family and home ownership were probably not of much significance to Bristol-Myers, but those questions were not improperly intrusive, sought information mostly available in public rec-ords, and were, in any event, largely answered. These ques-tions were no more intrusive than those asked on an applica-tion for life insurance or for a bank loan. If there were some questions that may have been overreaching in the circum-stances, the fundamental fact remains that the plaintiffs declined to answer a large number of incontestably rele-vant, and not unreasonably intrusive, questions. No public policy considerations protect an at-will employee in such a circumstance.

We affirm the judgments for the defendants, entered on their motion for judgments notwithstanding the jury's ver-dicts, on the plaintiffs' claims that the defendants terminat-ed their employment in violation of an obligation of good faith and fair dealing that should be imposed by law.

*Judgments affirmed.*

ABRAMS, J. (concurring). I concur with much of what the majority says in denying relief to the plaintiffs. The plaintiffs claim that the defendants invaded their right of privacy by requiring them to answer fully a questionnaire which could be used as the basis of a "comprehensive psychiatric evaluation." The plaintiffs produced some evidence in support of that claim, but no evidence that Bristol-Myers so used the questionnaire. The reason may well be that Bristol-Myers, in the past, has been known as a "non-user" of personality tests. A. Westin, Privacy and Freedom 137, 372 (1967).

I agree that "[m]ost of the unanswered questions were relevant to the plaintiffs' job qualifications and represented no invasion of the plaintiffs' rights of privacy protected by law." Further, in this case the plaintiffs voluntarily[1] answered the questions most likely to be viewed as objectionable.[2] The plaintiffs refused to answer, or gave flippant answers (see *supra* at 309 n.11) to, many relevant and unintrusive questions.[3] Therefore, I conclude that the plaintiffs failed to show an invasion of their privacy.

As I read the opinion, it implicitly recognizes that G. L. c. 214, § 1B, reflects a legislative concern for basic fairness, and an attempt to limit the extent to which informational

---

[1] This case does not raise the issue whether there would be a violation of G. L. c. 214, § 1B, if the plaintiffs had not voluntarily answered the questions. See A. Miller, Assault on Privacy 185-186 (1971) ("To talk of information being 'voluntarily' given in the context of . . . an employment relationship . . . is to ignore reality"). See also Employment Records, The Report of the Privacy Protection Study Commission, Appendix 3, at 6-7 (1977); Hermann, Privacy, The Prospective Employee, and Employment Testing. The Need to Restrict Polygraph and Personality Testing, 47 Wash. L. Rev. 73, 112 (1971). In this case, the plaintiffs answered some questions and refused to answer others which they felt were intrusive. In these circumstances, one can only conclude that the questions which were answered, were answered voluntarily.

[2] Cort failed to answer, or gave limited answers to, these questions.

[3] For example: "Aims: What are your qualifications for this position? What are your principal strengths? What are your principal weaknesses? . . . What income would you need in order to live the way you would like to live? . . . What are your plans for the future?"

activities of an employer may intrude on an employee's privacy. The opinion also suggests that employers may be limited to fair and unobtrusive methods of information collection, and to the collection of information relevant and necessary to a business purpose.

I believe the opinion recognizes that a careful balancing must be made between privacy interests and the need for the requested information, its materiality, and its relevance. Therefore, I would explicitly state the opinion's underlying premise: that an employee at will has an action for bad faith discharge if an employer discharges the employee for failure to provide private information. In such cases the issue would be "[a]t what point do inquiries about . . . employees become unduly intrusive?" Report of the Privacy Protection Study Commission: Personal Privacy in an Information Society 223 (1977).

Because of the plaintiffs' lack of proof, the opinion does not, and need not, focus on that issue. Nor does it address whether questions are more intrusive when the information requested is largely irrelevant to any business purpose of the employer.[4] See Report of the Privacy Protection Study Commission: Personal Privacy in an Information Society 236-237 (1977); Miller, the Privacy Revolution: A Report from the Barricades, 19 Washburn L. Rev. 1, 19 (1979); Comment, The Use and Abuse of Computerized Information: Striking a Balance Between Personal Privacy Interests and Organizational Information Needs, 44 Alb. L. Rev. 589, 601 (1980); Comment, Employee Privacy Rights: A

---

[4] The majority acknowledges that many of the questions asked are of little significance to the company. They concern: home ownership; value of mortgage; maiden name of spouse; spouse's age and occupation; age and health of parents; occupation of father, brothers, and sisters; off-the-job problems and worries. Other companies have eliminated this sort of question from their questionnaires. For example, the J.C. Penney Company has eliminated from its application forms, on the ground that the items were unnecessary: maiden name, date of birth, leisure activity, and physical or mental condition. International Business Machines Corporation has eliminated date of birth, spouse's employment and relatives employed by IBM. Privacy Report, Appendix 3, at 39.

Proposal, 47 Fordham L. Rev. 155, 192-193 (1978). I recognize that these determinations are best made on a case by case basis. "A well settled legal doctrine embodies the work of many minds, and has been tested in form as well as substance by trained critics whose practical interest it is to resist it at every step. These are advantages the want of which cannot be supplied by any faculty of generalization, however brilliant . . . ." O.W. Holmes, Codes, And The Arrangement of the Law, 5 Am. L. Rev. 1 (1870). Therefore, I concur.