UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT


Nos. 95-1690
95-1913

SCOTT P. HAMMOND,

Plaintiff, Appellee, Cross-Appellant,

v.

T.J. LITLE & COMPANY, INC.,

Defendant, Appellant, Cross-Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Zachary Karol, U.S. Magistrate Judge] 



Before

Cyr, Circuit Judge, 
Bownes, Senior Circuit Judge, 
and Stahl, Circuit Judge. 



Anthony M. Feeherry, with whom Paula M. Bagger and Goodwin, 
Procter & Hoar were on brief for appellant. 
Michael J. Liston with whom Glass, Seigle & Liston was on brief 
for appellee.



April 30, 1996


BOWNES, Senior Circuit Judge. This appeal arises BOWNES, Senior Circuit Judge. 

out of a dispute over the compensation terms of an employment

contract. Appellee/Cross-Appellant Scott P. Hammond

("Hammond") filed suit after he was discharged by

Appellant/Cross-Appellee T.J. Litle & Company, Inc. ("the

Company"), alleging that the Company had breached certain

terms of his employment contract entitling him to shares of

stock in the Company, and the implied covenant of good faith

and fair dealing. After a bifurcated trial in which certain

issues were decided by the jury and others by the magistrate

judge, the Company appeals and Hammond cross-appeals.

Finding no error, we affirm.

I. BACKGROUND

In the spring of 1986, Thomas J. Litle ("Litle")

was starting up the Company and Hammond was about to graduate

from the Harvard Business School. On May 4, 1986, Litle

orally offered Hammond the position of Vice President of

Finance and Administration, with a compensation package

including a current annual cash salary of $45,000, the right

to purchase a maximum of 100 shares of non-voting founders'

stock in the Company at a subscription price of $1.00 per

share, and deferred compensation of $10,000 per year to be

converted to additional shares of stock at Hammond's option.

Hammond accepted the package with the understanding that

there would be further negotiation regarding both a vesting

-2- 2

schedule for the 100 shares and the repurchase rights the

Company would have with respect to vested shares upon

termination of his employment. 

Hammond began employment with the Company on June

9, 1986. In July of 1986, the Company's outside counsel sent

Hammond, at his request, a draft Stock Restriction Agreement

and a draft Repurchase Agreement. Hammond then met with

Litle to discuss the draft agreements and requested a more

favorable vesting schedule for his 100 shares than that

reflected in the draft Repurchase Agreement. Litle agreed,

approving the change with a handwritten note. According to

the vesting schedule thus agreed upon, 16% of the shares

would vest on March 31, 1987, 2% would vest each month from

April 1, 1987 through February 28, 1990, and 14% would vest

on March 31, 1990. Litle and Hammond agreed that the draft

agreements were acceptable in all other respects. In August

of 1986, outside counsel prepared and sent Hammond execution

copies of the agreements. The Repurchase Agreement

incorporated the new vesting schedule, and the Stock

Restriction Agreement provided that a stockholder whose

employment was terminated "for cause" was required to tender

his vested shares to the Company for repurchase at fair

market value. 

In September of 1986, Hammond and Litle met for the

purpose of executing the agreements, but Hammond unexpectedly

-3- 3

requested a number of substantive changes. Based on his

belief that the parties had completed negotiations, Litle

rejected Hammond's proposed changes and the agreements were

not signed.

In a letter to Hammond dated March 31, 1987, Litle

took the position that agreement had not yet been reached

regarding Hammond's stock participation. Hammond became

upset and refused to report for work until the issue was

settled. At a meeting on April 14, 1987, Litle told Hammond

that he could acquire a maximum of 66 2/3 shares of stock,

that 25% of the shares would vest on each anniversary of

Hammond's employment date of June 9, 1986, and that before

half of the shares (33 1/3) would begin to vest according to

that schedule, Hammond would have to meet certain as yet

undefined performance standards. Hammond became angry and

refused to accept the changes. In a letter to Hammond dated

April 17, 1987, Litle memorialized the same terms, chastised

Hammond for his recent behavior, warned him that a recurrence

would be deemed a tender of resignation that would probably

be accepted, but encouraged him to attempt to redeem himself.

The new terms also were confirmed in a letter from General

Manager Bruce Alemian ("Alemian") to Hammond dated July 13,

1987. The evidence was in dispute regarding whether Hammond

ever accepted the new terms. The Company contended that he

did by reporting to work and tendering a check for $66.67.

-4- 4

Hammond contended that he continued to insist on 100 shares,

and tendered $100 but paid $66.67 because that was all Litle

would accept. 

At a meeting in December of 1987, Hammond again

complained that he believed he was entitled to acquire 100

shares. In an effort to settle matters, Alemian gave Hammond

a positive performance review and offered him the 33 1/3

performance shares if he would relinquish his claim to a full

100 shares. Hammond refused and Litle withdrew the offer of

the performance shares. On January 27, 1988, Hammond was

terminated. 

II. PRIOR PROCEEDINGS

In a Second Amended Complaint, Hammond alleged that

the Company had breached that part of his employment contract

entitling him to acquire shares of stock in the Company by

breaching the implied covenant of good faith and fair

dealing, terminating his employment because he refused to

accept Litle's unilateral alteration of his contract rights,

refusing to issue him the 100 shares due him under the

agreement, and refusing to issue him additional shares for

deferred compensation. 

By agreement of the parties, the trial was

bifurcated into a jury phase and a jury-waived phase. Phase

I was tried to a jury in June, 1994. The issues for the jury

were: (1) whether Hammond and the Company had entered into a

-5- 5

contract entitling Hammond to acquire company stock; and (2)

if so, how many shares Hammond was entitled to receive upon

termination of his employment. Through answers to special

questions submitted by the court, the jury found that the

parties had entered into a contract and that Hammond was

entitled to 48 shares. 

Phase II was tried to the court in December, 1994,

in order to resolve two remaining issues: (1) whether

Hammond had an obligation to offer the 48 shares back to the

Company for repurchase; and (2) whether the Company had an

obligation to issue 5 additional shares to Hammond in lieu of

deferred compensation. On June 7, 1995, the magistrate judge

issued a memorandum of decision, answering both questions in

the negative.

III. DISCUSSION

The Company appeals the jury's determination that

Hammond was entitled to 48 shares, and the magistrate judge's

determination that Hammond had no obligation to offer the

shares back for repurchase. Hammond cross-appeals,

challenging the magistrate judge's conclusion that the

Company need not issue him shares in lieu of deferred

compensation. 

A. The Jury's Determination That  
Hammond Was Entitled To 48 Shares 

The jury, answering special questions submitted by

the court, found that Hammond and the Company had entered

-6- 6

into an agreement in May of 1986 entitling Hammond to 100

shares of the Company's stock upon his acceptance of the

Company's offer of employment; that this contract was last

amended in the summer of 1986; and that Hammond was entitled

to 48 shares of stock as of the date his employment was

terminated.1

The Company concedes that there was evidentiary

support for the jury's determination that a contract for 100

shares was formed in May of 1986 and was last modified by the

vesting schedule agreed upon in the summer of 1986, but

contends that there was no evidence to support the jury's

finding that Hammond was entitled to 48 shares. 

The court had instructed the jury that if it found

(as it did) that a contract for 100 shares was formed in May

of 1986 and that it was last amended in the summer of 1986,

then it should determine the number of shares to which

Hammond was entitled according to one of three alternatives:

First, the jury could award Hammond at least 36 shares, which 

represented the number of shares that had vested between June

of 1986 and January 31, 1988, according to the vesting

schedule reflected in the execution copy of the Repurchase

 

1. Hammond had argued that the contract was never modified
after May of 1986 so that he was entitled to all 100 shares.
The Company had argued that no contract was ever formed, but
that if there was a contract, it was last amended in April of
1987 as reflected in Alemian's letter of July 13, 1987. The
jury rejected these alternatives.

-7- 7

Agreement prepared in August of 1986.2 Second, the jury 

could award Hammond 100 shares if it found that the contract

contained an implied term that Hammond would have a fair

opportunity to earn all 100 shares and that the Company had

breached that term by firing him without cause.3 If the

jury found that there was such an implied term, but that

there was cause for terminating Hammond, then he would be

entitled to only 36 shares.4 Third, the jury could award 

Hammond some number of shares greater than 36 if it found

that he was an at-will employee who could be terminated with

or without cause; that the Company terminated him "without

cause or in bad faith for the purpose of preventing him from

 

2. According to that vesting schedule, 16 shares vested as
of March 31, 1987, and 2 additional shares vested for each of
the next 10 months through Hammond's termination on January
31, 1988, for a total of 36 shares.

3. This instruction was based on Anthony's Pier Four, Inc. 
v. HBC Assocs., 583 N.E.2d 806 (Mass. 1991), in which the 
Supreme Judicial Court stated that "the implied covenant of
good faith and fair dealing provides 'that neither party
shall do anything that will have the effect of destroying or
injuring the right of the other party to receive the fruits
of the contract.'" Id. at 820 (citations omitted). 

4. The court defined "cause," consistent with the definition
set forth in Goldhor v. Hampshire College, 521 N.E.2d 1381, 
1385 (Mass. App. Ct. 1988), as meaning that "there is a
reasonable basis for the employer to be dissatisfied with the
employee's performance, entertained in good faith, for
reasons such as lack of capacity or diligence, failure to
conform to usual standards of conduct, or other culpable or
inappropriate behavior, or grounds for discharge reasonably
related, in the employer's honest judgment, to the needs of
the business . . . [w]hether or not you agree with the
employer's judgment."

-8- 8

getting his shares;" and that "some additional amount of

shares was intended to compensate Mr. Hammond not for further

services to be performed after January 31, 1988, but for

having accepted employment with the Company back in May or

June of 1986 [and] foregoing other possible employment

opportunities."5

The Company contends that the jury must have based

its verdict on the third alternative under the instructions

since it awarded Hammond neither 36 nor 100 shares, but that

there was no evidence that any number of shares was intended

to compensate Hammond for accepting employment with the

Company and foregoing other opportunities. The Company did

not object to the instruction that invited the verdict of 48

shares, and explicitly does not quarrel with that instruction

on appeal. It concedes that it forfeited its right to a new

trial by not moving for one in the district court pursuant to

Fed. R. Civ. P. 59(a), but asks that we remand to the

district court with instructions to enter judgment for 36

 

5. This instruction was based on Massachusetts case law
applying the implied covenant of good faith and fair dealing
to allow recovery of compensation already earned where an
employer terminates an at-will employee in bad faith for the
purpose of depriving him of compensation already earned,
e.g., Cataldo v. Zuckerman, 482 N.E.2d 849 (Mass. 1985); 
Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251 (Mass. 
1977), or without cause and not in bad faith but with the
effect of depriving the employee of compensation already
earned, Gram v. Liberty Mut. Ins. Co., 461 N.E.2d 796 (Mass. 
1984); Gram v. Liberty Mut. Ins. Co., 429 N.E.2d 21 (Mass. 
1981). 

-9- 9

shares. As Hammond correctly points out, however, the

Company also forfeited its right to a judgment for other than

48 shares by failing to raise the issue in a motion for

judgment as a matter of law. Fed. R. Civ. P. 50(a), (b). 

It is beyond peradventure that in order to

challenge the sufficiency of the evidence on appeal, a party

must first have presented the claim to the district court,

either by moving for judgment as a matter of law before the

case is submitted to the jury and renewing that motion after

the verdict, Fed. R. Civ. P. 50(a), (b), or by moving for a

new trial pursuant to Fed. R. Civ. P. 59. See Scarfo v. 

Cabletron Sys., Inc., 54 F.3d 931, 948 (1st Cir. 1995); 

Velazquez v. Figuero-Gomez, 996 F.2d 425, 426-27 (1st Cir.), 

cert. denied, 114 S. Ct. 553 (1993); La Amiga del Pueblo, 

Inc. v. Robles, 937 F.2d 689, 691 (1st Cir. 1991); Pinkham v. 

Burgess, 933 F.2d 1066, 1070 (1st Cir. 1991); Jusino v. 

Zayas, 875 F.2d 986, 991-92 (1st Cir. 1989); Wells Real 

Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 

810 (1st Cir.), cert. denied, 488 U.S. 955 (1988). 

Otherwise, we have no decision of the district court to

review, and will not review the weight of the evidence for

the first time on appeal. La Amiga, 937 F.2d at 691; Wells, 

850 F.2d at 810. The Supreme Court has stated that an

appellate court is "without power to direct the District

Court to enter judgment contrary to" the verdict absent a

-10- 10

Rule 50 motion in the district court. Cone v. West Virginia 

Pulp & Paper Co., 330 U.S. 212, 218 (1947).  

Here, the Company did not bring the asserted error

to the district court's attention in any way. After

Hammond's case but before the close of all the evidence, the

magistrate judge informed counsel that he intended to

instruct the jury that it could award Hammond any shares it

found were intended as consideration for his accepting the

Company's offer if it also found that the Company acted in

bad faith or without cause in discharging Hammond. The

Company argued at that point that there was no evidence to

support such an instruction but never renewed the argument by

objecting to the instruction after it was given, or by moving

for judgment as a matter of law or for a new trial on that

basis.6 At the close of all the evidence, the Company moved

for judgment as a matter of law, but argued only that there

was insufficient evidence that a contract to purchase 100

shares of stock was ever formed, or that if a contract was

formed, it was the one for 66 2/3 shares memorialized in

Alemian's letter to Hammond dated July 13, 1987. 

 

6. We do not mean to imply that a failure to object to an
instruction bars our review of a claim of insufficiency of
the evidence if the appellant has moved in the district court 
for judgment as a matter of law or for a new trial. See 
Boyle v. United Technologies Corp., 487 U.S. 500, 513-14 
(1988); St. Louis v. Praprotnik, 485 U.S. 112, 120 (1988) 
(plurality opinion of O'Connor, J., joined by Rehnquist,
White and Scalia, JJ.).

-11- 11

We do not think that this motion reasonably can be

read as encompassing the argument that no reasonable jury

could return a verdict including any shares intended as

consideration for Hammond's accepting the Company's offer.

See Wells, 850 F.2d at 810 (motion for judgment as a matter 

of law must "be made with sufficient specificity to allow the

district judge to understand precisely why the evidence is

insufficient" and "[a]ppellate review may be obtained only on

the specific ground stated in the motion"). Even if it could

be so read, it would not help the Company because it did not

renew the motion after the verdict. See Fed. R. Civ. P. 

50(b); Velazquez, 996 F.2d at 426-27.  

The Company complains that it could not have moved

for judgment as a matter of law on the grounds asserted here

because the standard requires that the evidence be "such that

a reasonable person could be led to only one conclusion,

namely that the moving party is entitled to judgment as a

matter of law." Johnson v. Nat'l Sea Prods., Ltd., 35 F.3d 

626, 630 (1st Cir. 1994). The Company asserts that its

argument that the jury could not as a matter of law conclude

that Hammond was entitled to 48 shares was not amenable to

that standard because the jury could have reached several

conclusions -- that Hammond was entitled to 8.34, 16, 36,

66.67 or 100 shares. 

-12- 12

The Company misreads our statement in the Johnson 

case. A party may move for judgment as a matter of law on an

issue by issue basis; it does not have to be all or nothing.

See Fed. R. Civ. P. 50(a)(1). The Company knew before the 

case went to the jury, when it first should have made the

argument it now presses, that the magistrate judge's

instruction would allow the jury to find that some number of

shares was intended as consideration for Hammond's acceptance

of the Company's offer. The Company could have argued then

and after the verdict, as it has here, that the evidence was

legally insufficient to support such a finding.7 By failing

to do so, it forfeited the claim.

We therefore review only for plain error resulting

in a manifest miscarriage of justice, see Simon v. Navon, 71 

F.3d 9, 13 (1st Cir. 1995), and find that there was none.

"It is fundamental to our system of jurisprudence that, when

the evidence as a whole can plausibly support more than one

view of a situation, '[j]urors, using common sense and

collective experience assess credibility and probability, and

proceed to make evaluative judgments, case by case.'" La 

Amiga, 937 F.2d at 691 (citations omitted). Though we see no 

evidence of an explicit agreement that 12 shares were

 

7. The Company also could have moved for a new trial or a
remittitur under Fed. R. Civ. P. 59 on that basis. See 11 
Charles A. Wright et. al, Federal Practice and Procedure  
2805, 2815 (1995).

-13- 13

intended as consideration for Hammond's accepting the

Company's offer of employment, there was evidence that before

accepting the offer, Hammond discussed with Litle how much

compensation he would need to forego his other offers, and

that his almost exclusive concern regarding compensation was

shares of stock, not cash salary. Alternatively, the jury

may simply have found that a contract was formed and last

amended in the summer of 1986, but that neither the minimum

of 36 shares nor the maximum of 100 shares was appropriate.

We doubt that such an outcome constitutes error at all in

this particular case, and it clearly does not amount to a

manifest miscarriage of justice. We therefore will not

disturb the verdict, particularly because the Company failed

to preserve the argument for appeal. See Braunstein v. 

Massachusetts Bank & Trust Co., 443 F.2d 1281, 1285 (1st Cir. 

1971). 

B. The Magistrate Judge's Determination 
That Hammond Had No Obligation To Offer 
The Shares Back For Repurchase 

After Phase II of the trial, the magistrate judge

found, based on the evidence and the jury's finding that the

parties had reached agreement regarding vesting during the

summer of 1986, that the parties had reached agreement at the

same time on all essential terms regarding stock restrictions

and repurchase rights, that those terms were reflected in the

execution copies of the Repurchase and Stock Restriction

-14- 14

Agreements prepared by the Company's outside counsel in

August of 1986, and that the parties deemed execution of the

final versions of the written agreements to be a mere

formality and not a condition to the effectiveness of their

agreements. The Stock Restriction Agreement provided in

relevant part that:

[i]n the event the Corporation terminates
the employment of the Stockholder for
cause, the Stockholder shall within five
(5) days after such termination offer in
writing all of the Shares then owned by
him . . . to the Corporation for purchase
at [fair market value].

The magistrate judge concluded that Hammond had no duty to

offer his shares back to the Company for repurchase because

although the Company had offered evidence showing "at most,

that [it] had grounds to terminate Hammond for cause," it had

"not . . . in fact opted to do so."8 

Alemian, who made the decision to terminate

Hammond, testified that he decided to fire Hammond in part

because he had not completed the monthly financial statements

 

8. The magistrate judge correctly ruled that the Statute of
Frauds, U.C.C. 8-319, did not bar enforcement of the
repurchase provision of the Stock Restriction Agreement
against Hammond. Hammond stated in his pleadings that an
oral contract was formed in May of 1986 for the purchase of
100 shares of stock and testified that he understood the
contract to be subject to further negotiation regarding
vesting and stock restriction issues; the repurchase
provision therefore was an integral part of a contract
Hammond admits was made and that he sought to enforce. See 
Mass. Gen. L. ch. 106, 8-319(d). The Company does not
contend that the Statute of Frauds would prevent enforcement
of any part of the contract against it.

-15- 15

for September through December of 1987, but primarily because

of his inability to overcome his negative feelings about the

stock situation. Alemian testified that Hammond's own

motivation and ability to motivate others had suffered in

April of 1987 when Litle first proposed the reduced stock

package, but that he was able to function properly after

Litle warned him. In December of 1987, Alemian began to

observe the same frustration in Hammond. He explained the

basis of his decision to discharge 

-16- 16

Hammond on January 27, 1988, as follows:

I felt that he was never going to be able
to get beyond his frustration and
disagreement with the contractual change,
and that that ultimately was impacting on
his ability to perform in the company at
the level that one would expect from a
CFO and one of three or four top
management people in the organization.
Much of that performance would not only
relate to specific duties, but also
projections to the rest of the
organization and setting . . . a positive
tone in the company. I just didn't feel
that he could get beyond that, and that,
in fact, the company's well-being would
be jeopardized at that point if I allowed
the situation to go forward.

Alemian further testified that other than the performance

problems stemming from the dispute over the shares of stock,

Hammond's performance had been fully adequate, and that if he

did not believe that Hammond was of value to the Company, he

would not have attempted to settle the matter on prior

occasions.9

Alemian and Hammond both testified about what

Hammond was told when he was terminated on January 27, 1988.

Alemian testified that after he told Hammond that his

employment was terminated as of that date, Hammond asked if

it was because of his performance, and Alemian replied that

 

9. The Company also presented the testimony of three of its
employees describing deficiencies in Hammond's management and
accounting methods, but these witnesses were lower level
employees who took no part in the decision to fire Hammond,
and most of what they described was not observed by or
communicated to Hammond's superiors. 

-17- 17

"it was not." Rather, he "told him that the relationship

issues between he [sic] and the chairman of the company Tim

Litle had reached a point in my mind where the conflict

between the two was in the way of the continued development

of the company." Alemian testified that he "did not say to

him that he was being terminated for cause," and that Litle

had not instructed him to tell Hammond that he was being

terminated for cause. 

Hammond testified that after Alemian said that he

was terminated, he said, "I presume this has nothing to do

with my performance, it's because I'm not agreeing to the

stock cut," and Alemian responded, "Yeah, that's correct,

it's not your performance, it's the fact that you have this

dispute with the chairman of the company and it can't

continue and you've got to go. We can't get rid of the

chairman of the company." 

Based on the foregoing evidence of the

circumstances surrounding Hammond's termination, the

magistrate judge stated:

[W]hether or not the Company had grounds
to terminate Hammond for cause, and
whether or not its decision to terminate
Hammond, although not communicated to him
at the time of termination, was the
result of its disappointment with his
performance, the Company deliberately
chose not to attempt to exercise its
right to terminate Hammond for cause.
Instead, no doubt with the hope of
avoiding an immediate confrontation, it

-18- 18

elected to exercise its alternative right
to terminate him without cause. 

In addition to the fact that Alemian specifically

told Hammond that he was not being terminated because of his

performance, the magistrate judge relied on a letter the

Company sent to Hammond on February 19, 1988. The letter

confirmed events regarding his termination but gave "no hint

that Hammond was terminated for cause." Although Hammond had

not tendered his vested shares to the Company, the Company

did not demand that he do so in the letter or otherwise. The

letter stated that the Company was exercising its "right" to

purchase Hammond's unvested shares and enclosed a check for

those shares, but said only that it was "prepared" to discuss

repurchasing his vested shares and invited Hammond to contact

the Company "if" he wished to discuss such repurchase. The

magistrate judge found that the "precatory language"

regarding the vested shares in a letter sent 19 days after

the effective date of Hammond's termination could "not be

squared with the Company's present contention that Hammond

had a duty to offer his shares to the Company within five 

days of his termination." Finally, the magistrate judge

relied on the fact that the Company's by-laws permitted the

Board of Directors to remove an officer "with or without

cause," but if removed for "cause," the officer was to be

given notice and opportunity to be heard by the Board of

-19- 19

Directors, and Hammond was not given notice or an opportunity

to be heard. 

The Company appeals the magistrate judge's ruling

that Hammond was not terminated for cause, claiming two

alternative errors of law. The Company argues that under

Massachusetts law it is the objective existence of cause, and

not the reason the employer communicates to the employee upon

termination, that controls the determination of whether the

employee was discharged for cause. Alternatively, the

Company contends that if what the employer tells the employee

does control, then the magistrate judge applied an overly

narrow definition of "cause" by relying only on Alemian's

denial that he was terminating Hammond for inadequate

performance, and ignoring that Alemian also told Hammond that

he was being terminated because of his "relationship issues"

with Litle. Hammond responds that the magistrate judge's

determination that the Company chose not to terminate him for

cause was a finding of fact with ample record support.

Though the magistrate judge's conclusion was a finding of

fact, the issues the Company raises question whether, in so

finding, the magistrate judge considered the wrong factors or

misdefined "cause" as a matter of Massachusetts law. We

address these claimed errors of law de novo. Juno SRL v. S/V 

Endeavour, 58 F.3d 1, 4 (1st Cir. 1995). 

-20- 20

The Company principally relies on Klein v. 

President and Fellows of Harvard College, 517 N.E.2d 167 

(Mass. 1987), for its contention that it is the objective

existence of cause, and not what the employer tells the

employee upon termination, that controls the determination of

whether the employee was discharged for cause. In Klein, the 

trial court found that the dean had terminated the plaintiff

as if she were an at-will employee who could be discharged

for any reason within a three-month probationary period, but

that she had an employment agreement for a definite period of

time and therefore could be terminated only for cause. Id. 

at 169. According to the trial court, her termination as a

probationary employee therefore was a breach of her

employment contract. The Supreme Judicial Court reversed,

ruling that the plaintiff's dismissal was for cause. The

plaintiff, who was an administrative director at Harvard's

school of public health, had strained and acrimonious

relationships with faculty members and had been evaluated by

them as being unhelpful, difficult to work with and a poor

administrator. Id. at 168. The dean terminated Klein 

because of her poor performance and a particularly

disparaging memorandum she had written about one faculty

member. Id. Although the dean did not recite those reasons 

in his formal letter of termination (stating only that

"regretfully, we have to terminate your services"), he did

-21- 21

discuss them with Klein in a meeting four days before he

issued the letter. The court stated:

The important point is that the 
plaintiff, notwithstanding the letter of
dismissal, knew why her employment was 
terminated. . . . Any notions the 
plaintiff might have entertained that she
was doing her work diligently and
competently and that her conduct was
appropriate were reasonably dispelled on
March 24th, when the dean met with her 
and discussed her job performance and 
"ill-considered" memorandum to the 
executive committee. 

Id. at 170 (emphasis added).  

Thus, Klein stands for the proposition that, when 

an employee may only be terminated for cause, whether the

employer so informs the employee plays a decisive role in a

court's later determination of whether the employee was

discharged for cause (unless, of course, the stated reason

was a pretext). We think that the same principle applies

where, as here, an employee may be terminated without cause,

but other rights and duties under the employment contract

depend on whether the employee is terminated for cause. The

interpretation of Massachusetts law sought by the Company

would allow an employer to enter into an employment contract

spelling out rights and duties that hinge on whether the

employee is terminated for cause, then tell the employee that

he is not being terminated for cause, then seek the benefits

of a termination for cause by articulating cause as its

-22- 22

reason in any ensuing litigation. As Klein indicates, that 

is not the law. 

The Company urges that Cort v. Bristol-Myers Co., 

431 N.E.2d 908 (Mass. 1982), also supports the proposition

that its stated reason for terminating Hammond is irrelevant.

In Cort, the plaintiffs, who were at-will employees, were 

fired after they refused to answer part of a company

questionnaire which they regarded as invading their privacy.

Although the plaintiffs' performance records were good, they

were notified that they were being discharged for poor

performance. Id. at 909. The plaintiffs then sued, claiming 

that they were terminated in bad faith because the employer

gave a pretextual reason for discharging them, and that the

real reason -- their refusal to complete the questionnaire --

was contrary to public policy. Id. at 911. The Supreme 

Judicial Court held that "an at-will employee discharged

without cause does not have a claim for damages simply

because the employer gave him a false reason for his

discharge," id., and that firing the plaintiffs for their 

incomplete answers to the questionnaire violated no principle

of public policy. Id. at 912. The court explained, however, 

that the fact that an employer gave a false reason would be

relevant if by giving it the employer was attempting to

conceal its real reason for discharge and the real reason

violated public policy. Id. at 911 n.6. Thus, according to 

-23- 23

Cort, an employer's stated reason is irrelevant where no 

consequences flow from either the real reason or the stated

false reason. But where, as here, consequences flow from

whether the termination was for cause, the employer's stated

reason is determinative, assuming it is not pretextual.

The Company contends that King v. Driscoll, 638 

N.E.2d 488 (Mass. 1994), also supports its position. In

King, the employer's real and stated reason for terminating 

King was that he participated in a shareholder derivative

suit against the company. Id. at 491. The Supreme Judicial 

Court reversed the trial court's ruling that this reason

violated public policy. Id. at 492-93. It upheld the trial 

court's conclusion that the employer had not violated its by-

laws by not providing King notice and a hearing as required

in a termination for cause, because King was terminated

without cause. Id. at 495. The court rejected King's 

contention that the legitimate business reasons the employer

proffered at trial showed that he was terminated for cause,

finding that the employer likely would not have advanced

those reasons but for King's claim that he was terminated in

violation of public policy. Id.  

King hardly supports the Company where it 

articulated Hammond's poor performance as the reason for his

discharge, not when it let him go, but after he filed suit 10

months later. True, Litle discussed performance issues with

-24- 24

Hammond in September of 1986, April of 1987, and October of

1987, but those problems centered primarily around the stock

dispute and there was ample evidence that Alemian and Litle

nonetheless valued Hammond as an employee and that his

performance improved after he was warned. When Hammond was

terminated in January of 1988, Alemian affirmatively stated

that his performance was not the reason. As the magistrate

judge stated, "there was no evidence that, when the boom was

actually lowered, the Company advised Hammond that he was in

fact being terminated for cause." Assuming the Company could

have terminated Hammond for cause, it chose not to act on

that basis, and cannot erase the choice it made by

articulating different reasons in the course of litigation. 

That brings us to the Company's alternative

argument -- that if the employer's stated reason does

control, the magistrate judge defined "cause" too narrowly by

relying only on Alemian's denial that performance was the

basis for his termination, and ignoring that he also told

Hammond that the reason was his "relationship issues" with

Litle, which the Company contends also constitutes "cause"

under Massachusetts law. "Cause" for termination includes:

(1) a reasonable basis for employer
dissatisfaction with a[n] . . . employee,
entertained in good faith, for reasons
such as lack of capacity or diligence,
failure to conform to usual standards of
conduct, or other culpable or
inappropriate behavior, or (2) grounds
for discharge reasonably related, in the

-25- 25

employer's honest judgment, to the needs
of his business. Discharge for "just
cause" is to be contrasted with discharge
on unreasonable grounds or arbitrarily,
capriciously, or in bad faith.

Goldhor v. Hampshire College, 521 N.E.2d 1381, 1385 (Mass. 

App. Ct. 1988) (citations omitted). 

We think that the magistrate judge well understood

that this definition embraces reasons other than performance,

and so instructed the jury. See note 4, supra. Rather than 

misperceiving the meaning of cause, the magistrate judge

obviously found that the only basis for cause supported by

the evidence was inadequate performance, stemming from the

stock dispute or otherwise, but that the Company specifically

eschewed that as its reason. According to Alemian's and

Hammond's testimony, Hammond was terminated, at best, because

he had "relationship issues" with Litle, or at worst, because

he refused to accept the reduced stock package. The latter

reason could well be viewed as a termination in bad faith for

the purpose of depriving Hammond of shares to which he was

entitled, which, of course, does not constitute just cause.

And according to our reading of Massachusetts law, a

"relationship issue" is not, without more, cause for

termination. 

The Company cites Klein and Goldhor in support of 

its contention that when an employee holds a managerial or

supervisory position, a "relationship issue" or "personality

-26- 26

conflict" may properly be considered cause for termination.

The Company mischaracterizes Klein as so holding because the 

employee in that case was terminated for poor performance.

In Goldhor, the director of a research center at Hampshire 

College had an intense difference of opinion with a tenured

professor about how funds were to be raised for the center.

Goldhor, 521 N.E.2d at 1383. This led to a public power 

struggle, with each demanding that the other leave the

center, and the president of the college deciding that the

director would have to leave since the professor was tenured.

Id. at 1383-84. The Massachusetts Appeals Court held that 

the trial court improperly directed a verdict for the college

because it did not follow termination procedures contained in

the employee manual. Id. at 1382. The court indicated that 

if the issue of "just cause" was reached on retrial, the

plaintiff's conflict with the professor would be an

appropriate consideration, but did not indicate that it would

be controlling. Id. at 1385. Moreover, in contrast to 

Goldhor, Hammond's disagreement with Litle was not over how 

any aspect of the business was run, but concerned the terms

of his employment contract. As already noted, Hammond's

resistance to what he believed to be a breach of his

employment contract could not be considered "just cause" for

his termination. That aside, the conflict in this case had

not risen to the level, as in Goldhor, where Litle and 

-27- 27

Hammond could not continue to work together. As Litle

testified, he had no intention of terminating Hammond and did

not call for his termination, but simply accepted Alemian's

recommendation that he be terminated. Finally, we note

(though the magistrate judge did not mention it) that the

jury's finding that Hammond was entitled to 48 shares

necessarily included a finding that the Company terminated

Hammond either without cause or in bad faith for the purpose

of preventing him from getting his shares.

In sum, we think the magistrate judge correctly

found that the only reason the Company may have had to

terminate Hammond that amounted to just cause under

Massachusetts law was Hammond's performance, that it chose

not to terminate him for that reason and told him so, and

that he therefore had no obligation to sell his shares back

to the Company.

C. The Magistrate Judge's Determination That 
The Company Had No Obligation To Issue 
Hammond Shares In Lieu Of Deferred 
Compensation 

In their joint pretrial memorandum, the parties

stipulated that Hammond had a contractual right to convert,

at his option, his accrued deferred compensation into stock,

and that if he properly exercised his option, he was entitled

to 5 shares. The issue for Phase II of the trial was whether

Hammond properly exercised his option by filing his lawsuit

10 months after his employment was terminated. The

-28- 28

magistrate judge ruled that Hammond had not exercised his

option within a reasonable time by filing his lawsuit 10

months after his discharge, that even then the prayers for

relief in Hammond's complaint did not constitute an attempt

to exercise his option, and that he had failed to carry his

burden of proving that it would have been futile to attempt

to exercise his option at or nearer the time he was

terminated. 

Hammond first claims that the magistrate judge

erred as a matter of law in construing the contract as

requiring him to exercise his option during his employment or

within a reasonable time of his termination. He claims that

the time frame for the exercise of his option was as long as

his compensation remained deferred. Because there was no

explicit agreement between the parties as to when Hammond was

required to exercise his conversion right, the magistrate

judge was called upon to decide whether Hammond exercised it

within a "reasonable time." See Bushkin Assocs., Inc. v. 

Raytheon Co., 815 F.2d 142, 146 (1st Cir. 1987) ("when a 

contract is silent as to time, the term shall be a reasonable

time based on all the relevant evidence."). The magistrate

judge's determination that he did not was a finding of fact

subject to the clearly erroneous standard of Fed. R. Civ. P.

52(a). See, e.g., Crellin Technologies, Inc. v. 

Equipmentlease Corp., 18 F.3d 1, 9 (1994) (what amount of 

-29- 29

time is reasonable in a particular case is a "classic

example" of a decision that the law leaves to the district

court); Flagship Cruises, Ltd. v. New England Merchants Nat'l 

Bank, 569 F.2d 699, 702 (1st Cir. 1978) ("The reasonableness 

of a period of time except as to extremes would seem to be a

classic issue for the trier of fact."); Cataldo, 482 N.E.2d 

at 857 n.20 (question whether buyback option was exercised

within a reasonable time "was peculiarly appropriate for

decision by the factfinder"). Hammond argues that in making

that factual determination, the magistrate judge impliedly

interpreted the contract to require him to exercise his

option within a reasonable time of his employment rather than

at any time while the compensation remained deferred. This,

Hammond argues, was a question of law, Fashion House, Inc. v. 

K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989), subject to 

de novo review.  

Recognizing that the magistrate judge's

determination that Hammond did not act within a reasonable

period was a finding of fact that contained a ruling of law,

we find that the magistrate judge erred neither as a matter

of law nor as a matter of fact because the ruling was well-

supported by the "nature of the contract, the probable

intention of the parties as indicated by it, and the

attendant circumstances." Charles River Park, Inc. v. Boston 

Redevelopment Auth., 557 N.E.2d 20, 32 (Mass. App. Ct. 1990). 

-30- 30

Hammond's right to convert his deferred compensation into

stock, as memorialized in various documents (most of which

Hammond himself drafted), was described as the "employee's"

option or choice. Hammond urges that when he was terminated,

he was in the position of a non-employee investor holding

convertible debt keyed to the period during which the debt

remained outstanding. This is so, he argues, because the

Company's position was that he would not receive his deferred

compensation until the Company achieved a better cash flow

situation. Although that may have been the Company's

position with regard to paying cash for deferred 

compensation, nothing in the record indicates that Hammond's

option to convert deferred compensation into stock was

similarly contingent. Even more to the point, nothing in the

record indicates that the Company intended that a former

employee could turn a simple deferred employee compensation

arrangement into a right to purchase stock at a very low

price at some time in the indefinite future when the stock

became far more valuable. As the magistrate judge found, the

stock valuation rate at the time Hammond was terminated was

such that the shares he would have received were worth far

less than the deferred compensation of $16,000 to which he

was entitled.10 The testimony at trial demonstrated that

 

10. Hammond could convert his deferred compensation into
stock at a "price equal to the stock's fair market value at
the time the deferred compensation was earned," but the price

-31- 31

other employees regarded as laughable the notion that anyone

would elect to accept stock in lieu of cash in March of 1988

when the Company began paying deferred compensation. The

magistrate judge correctly keyed the reasonable period of

time to Hammond's employment.

Hammond also claims that the magistrate judge's

failure to find as a matter of fact that the Company had

repudiated his contractual right to convert his deferred

compensation into stock, thus relieving him of any duty to

exercise his option, was clearly erroneous. Repudiation by

one party relieves the other party from further performance,

but such repudiation "'must be a definite and unequivocal

manifestation of intention [not to render performance].'"

Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 

1158, 1164 (1st Cir. 1992) (quoting 4 Arthur L. Corbin,

Corbin on Contracts 973, at 905-06 (1951)); see also 

Restatement (Second) of Contracts 250 cmt. b (1981). 

The magistrate judge did not err in failing to find

that the Company repudiated the contract. When Alemian

terminated Hammond on January 27, 1988, he offered Hammond

deferred compensation at a minimum rate of $2,000 per month

to be paid in cash as soon as the Company had sufficient

 

would be "no less than the latest price paid by investors."
The latest price paid by investors in early 1988 was $3,000
per share, which apparently was more than it actually was
worth at the time. 

-32- 32

funds, but Hammond did not say at that point that he elected

to exercise his option to receive the deferred compensation

in the form of stock. Alemian followed up with a letter

dated February 19, 1988, in which he stated that the Company

was "prepared to discuss . . . payment of deferred

compensation," and asked Hammond to contact him if he wished

to discuss it. Hammond did not respond. Hammond complains

that Alemian did not mention his right to convert deferred

compensation to stock at his exit interview or in the letter,

but that does not mean that the Company repudiated its duty

to honor that right. It was Hammond's option to exercise,

and Hammond made no effort to do so until 10 months after he

was terminated. 

Because the magistrate judge did not err in finding

that 10 months from Hammond's termination was not a

"reasonable time," we need not decide whether he correctly

found in the alternative that the prayer for relief in

Hammond's complaint did not constitute an exercise of his

option, or whether the Company later repudiated Hammond's

right to convert deferred compensation into stock in the

course of this litigation.

One matter remains. Shortly before oral argument,

Hammond moved this Court for leave to file a motion in the

district court pursuant to Fed. R. Civ. P. 60(a) to correct a

purported omission in the judgment, to wit, that the

-33- 33

magistrate judge ordered only that the Company was not

required to issue shares in lieu of deferred compensation but

failed to order the Company to pay Hammond his deferred

compensation in cash. The motion was denied without

prejudice to reconsideration by the panel hearing the merits.

We deny the motion because Hammond did not seek the relief of

being paid his deferred compensation in cash. This is

because whether the Company owed it in cash was not at issue.

As the magistrate judge found, the Company admitted that it

owed Hammond the deferred compensation, and the Company has

stated that it stands ready to pay Hammond $16,468.30 in cash

as soon as this appeal is decided. 

For all of the foregoing reasons, the judgment is

affirmed. The parties shall bear their own costs of appeal. 

-34- 34